

## NUMBER 13-06-311-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**AEP TEXAS CENTRAL COMPANY, ET AL.,**                 **Appellants,**

**v.**

**PUBLIC UTILITY COMMISSION OF TEXAS,**                 **Appellee.**

---

**On appeal from the 261st District Court of Travis County, Texas.**

---

## O P I N I O N

**Before Chief Justice Valdez and Justices Yañez and Benavides**
**Opinion by Justice Benavides**

On December 2, 2002, pursuant to section 39.202(c) of the Texas Utilities Code,

AEP Texas Central Company[1] ("TCC") filed an application for its final fuel reconciliation

with the Public Utility Commission of Texas (the "Commission"), for the period July 1, 1998

---

[1] At the time it filed its final fuel reconciliation, TCC was known as Central Power & Light.

to December 31, 2001.[2]  *See* TEX. UTIL. CODE ANN. § 39.202(c) (Vernon 2007).  Several cities (the "Cities"),[3] the Office of Public Utility Council ("OPC"), and Texas Industrial Energy Consumers ("TIEC") intervened and recommended various disallowances to TCC's petition.  After hearings, the Commission issued its Order on Rehearing, the final order in this case.  TCC and the Cities appealed the Commission's decision to the Travis County District Court, which affirmed the decision in all respects.[4]

By six issues, TCC challenges the Commission's decision and the district court's affirmance.  TCC argues that the Commission erred by (1) extending the reconciliation period; (2) not following prior reconciliation methodology; (3) improperly sharing off-system margins; (4) arbitrarily treating TCC and its sister company differently regarding the load-forecasting settlement in Docket No. 25755; (5) disallowing certain replacement power costs; and (6) finding that certain TCC energy contracts contained implicit capacity costs.

Raising six issues, the Cities also appeal the Commission's decision and the district court's affirmance.  The Cities assert that the Commission erred by (1) including capacity costs in eligible fuel expenses; (2) quantifying the amount of imputed capacity costs; (3) failing to determine whether TCC paid an unreasonable price for firm energy; (4) failing to exclude overcharges by the Department of Energy; (5) reconciling replacement fuel costs

---

[2] *See Application of Central Power and Light for Authority to Reconcile Fuel Costs*, Public Utility Commission Docket No. 27035 *available at* http://interchange.puc.state.tx.us/ (last visited 12/15/2008).

[3]  The Cities include the following: Alice, Aransas Pass, Big Wells, Camp Wood, Carrizo Springs, Corpus Christi, Dilley, Eagle Pass, Edinburg, Edna, Freer, Ganado, George West, Goliad, Harlingen, Indian Lake, La Feria, Laguna Vista, Laredo, Los Fresnos, Luling, Lyford, Mathis, McAllen, Mercedes, Odem, Orange Grove, Palm Valley, Pearsall, Port Aransas, Port Isabel, Port Lavaca, Rancho Viejo, Refugio, Rockport, Roma, San Benito, Santa Rosa, Sinton, Taft, and Victoria.

[4] *See* TEX. GOV'T CODE ANN §§ 2001.171, 2001.176 (Vernon 2008); TEX. UTIL. CODE ANN. § 15.001 (Vernon 2007).

arising from imprudence at the South Texas Nuclear Project; and (6) allowing spot coal costs that were imprudently incurred.

We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Through the Public Utility Regulatory Act, the Texas Legislature empowered the Commission to regulate utilities. *See* TEX. UTIL. CODE ANN. §§ 11.001-66.017 (Vernon 2007 & Supp. 2008); *Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.*, 101 S.W.3d 129, 133-34 (Tex. App.–Austin 2003), *rev'd in part sub nom. CenterPoint Energy, Inc. v. Pub. Util. Comm'n*, 143 S.W.3d 81 (Tex. 2004). Under the utility code, each electric utility operated as a monopoly in a designated service area, with regulated rates. *Id.*; *see also Office. of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 104 S.W.3d 225, 227-28 (Tex. App.–Austin 2003, no pet.).

The Commission set rates for the utilities that allowed the utilities to recoup their prudently incurred costs and to receive a reasonable return on their investments. *Reliant Energy, Inc.*, 101 S.W.3d at 133. However, because the cost of fuel changes often, and the Commission cannot hold rate proceedings to establish the rates utilities can charge every single time the cost of fuel changes, the utilities code utilizes a "fuel factor." *See* 16 TEX. ADMIN. CODE § 25.237 (2008). "Fuel factors are calculated by dividing the electric utility's projected net eligible fuel expenses by the corresponding projected kilowatt-hour sales for the period in which the fuel factors are expected to be in effect." *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 185 S.W.3d 555, 561-62 (Tex. App.–Austin 2006, pet. denied).

3

In other words, the code permitted the electric utilities to charge rates that included the recovery of fuel costs reasonably expected to be incurred. *City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896, 898 (Tex. App.–Austin 1993, writ denied). Periodically, through a proceeding before the Commission, the electric utilities had to reconcile the revenues actually received with the expenses actually incurred. *See* TEX. UTIL. CODE ANN. § 36.203(e) (Vernon 2007); *City of El Paso,* 851 S.W.2d at 897-98. If the electric utility had under-recovered its fuel expenses, it would recover the difference through a surcharge to its customers. *See* 16 TEX. ADMIN. CODE § 25.236 (2001) (containing the Commission's fuel rules). If the electric utility had over-recovered its fuel expenses, it would refund that amount to its customers. *Id.*

The legislature deregulated the retail electricity market in 1999. *See* TEX. UTIL. CODE ANN. § 39.001 (Vernon 2007). Part of the transition to retail electricity competition mandated by the legislature required the electric utilities to pursue a final fuel reconciliation for the period ending the day before the date customer choice was introduced. TEX. UTIL. CODE ANN. § 39.202(c). The electric utilities were to carry forward any under- or over-recovery to a proceeding that would determine each electric utility's "stranded costs" to be passed on to ratepayers in that utility's former designated service area. *Id.*

TCC filed its application for a final fuel reconciliation seeking to reconcile, among other things, a total "Eligible Fuel Expense" of approximately $1.7 billion and "Fuel Factor Revenues" of approximately $1.6 billion. Upon receipt of TCC's petition for its final fuel reconciliation, the Commission referred the application to the State Office of Administrative Hearings for a contested case hearing, where administrative law judges ("ALJs") received

4

evidence and heard testimony. The ALJs then recommended, with some disallowances, that the Commission approve the application.

The Commission considered the ALJs' proposal for decision and remanded the case for the taking of additional evidence on the issue of whether some of TCC's purchased-power contracts contained embedded "capacity" costs, which were not costs eligible for reconciliation. An ALJ issued a second proposal for decision, and the Commission then issued an "Order on Rehearing" adopting the original proposal for decision as modified on remand. TCC and the Cities appealed the Order on Rehearing to the Travis County District Court, which affirmed the Commission's order in all respects. This appeal followed.[5]

## II. TCC Issues Nos. 1 & 2: The Reconciliation Period and Methodology

In its first issue, TCC alleges that the Commission violated the utility code by extending the end of the reconciliation period. In its second issue, TCC contends that the Commission violated its own rules by applying a different fuel reconciliation methodology than that used in prior reconciliations. TCC claims that the prior methodology involved reconciling expenses incurred in one month with revenues billed that same month.

## A. Background

The legislature found implementing competitive electric markets to be in the public interest and that the public interest requires that "electric services and their prices should

---

[5] This appeal was transferred from the Third Court of Appeals to the Thirteenth Court of Appeals under a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005). "In cases transferred by the Supreme Court from one court of appeals to another, the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court." TEX. R. APP. P. 41.3.

5

be determined by customer choices and the normal forces of competition." TEX. UTIL. CODE ANN. § 39.001(a). Under the utilities code, the state implemented "on January 1, 2002, a competitive retail electric market that allows each retail customer to choose the customer's provider of electricity." *Id.* § 39.001(b)(1); *see CenterPoint Energy*, 143 S.W.3d at 90; *Cities of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 188 S.W.3d 681, 686 (Tex. App.–Austin 2005, pet. denied). Chapter 39 of the utilities code was "enacted to protect the public interest during the transition to and in the establishment of a fully competitive electric power industry." TEX. UTIL. CODE ANN. § 39.001(a).

With that underlying policy, the legislature instructed the Commission to hold a final fuel reconciliation upon application by each utility. Section 39.202(c) commands each formerly regulated monopoly to file a final fuel reconciliation "for the period ending before the date customer choice is introduced." *Id.* § 39.202(c). The utility code does not define "the date customer choice is introduced."

Customers who chose to switch to retail providers would be transferred to their provider of choice after TCC completed a final meter read during January 2002. Thus, even after January 1, 2002, when deregulation was set to begin, TCC continued providing bundled-rate service to customers until the final meter read. TCC acknowledged that a final meter read would be required before a customer could be switched to his provider of choice and argued that customers could have arranged a special meter reading that would have allowed customers to be switched prior to the time their normal meter read occurred.

In TCC's final reconciliation, the Commission determined that the "date customer choice is introduced" means the date that customers enter the competitive retail electric market by choosing their own retail electric provider. TCC claims that the final fuel

6

reconciliation should include expenses and revenues incurred or received up to December 31, 2001, but not, as the Commission ordered, through the entire period that TCC customers received bundled service. According to TCC, this allowed the Commission to improperly include in TCC's final fuel reconciliation certain expenses and revenues: those incurred or received to provide service to customers under its "bundled" rate on and after January 1, 2002, but prior to customers switching service to retail electric providers.[8] *See* TEX. UTIL. CODE ANN. § 39.202(c). Ultimately, this decision by the Commission required TCC to reconcile $43,429,462.00 in revenues billed in 2002 and $10,591,133.00 in expenses incurred in 2002, representing the amounts incurred up to the point customers were switched to retail providers.

## B.    Standard of Review:  Statutory Construction

We review questions of statutory construction de novo. *State v. Pub. Util. Comm'n of Tex.*, 246 S.W.3d 324, 332. Our goal is to determine and give effect to the legislature's intent. *Id.* We look to the statute as a whole, to determine legislative intent, and begin with the plain language of the statute, applying its common meaning. *Id.* "Where the statutory text is unambiguous, we adopt a construction supported by the statute's plain language, unless that construction would lead to an absurd result." *Id.*

We are to give serious consideration to the Commission's construction of statutes it is charged with enforcing so long as the construction does not contradict the plain wording of the statute and is reasonable. *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d

---

[8] The "bundled" rate is the rate utilities charged customers for all service provided by the utility before deregulation, while the utility was still a "bundled" utility (i.e., power generation company, retail electric provider, and transmission and distribution utility). *See* TEX. UTIL. CODE ANN. § 39.051 (Vernon 2007) ("Unbundling").

7

820, 823 (Tex. 1993); *Steering Comms. for the Cities Served by TXU Elec. v. Pub. Util. Comm'n of Tex.*, 42 S.W.3d 296, 300 (Tex. App.–Austin 2001, no pet.). We "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise, or deal with a nontechnical question of law." *Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.–Austin 2001, no pet.). We are to give deference to the Commission's construction of its own rules, so long as that construction is reasonable. *Pub. Util. Comm'n of Tex. v. Gulf States Util. Co.*, 809 S.W.2d 201, 207 (Tex. 1991).

## C.   TCC's Issue No. 1:   Extending the Ending Date of TCC's Final Fuel Reconciliation

In mandating retail electricity customer choice, the legislature required that "each affiliated power generation company[9] shall file a final fuel reconciliation for the period ending the day *before the date customer choice is introduced*." TEX. UTIL. CODE ANN. § 39.202(c) (emphasis added). The legislature chose not to define "the date customer choice is introduced." *Id.* According to TCC, the legislature's intention is clear: the state will "implement on January 1, 2002, a competitive retail electric market that allows each retail customer to choose the customer's provider of electricity." *Id.* § 39.001(b)(1); *see CenterPoint Energy*, 143 S.W.3d at 90; *Cities of Corpus Christi*, 188 S.W.3d at 686. TCC argues that this is evidence that the legislature did not intend for the final fuel reconciliation to include any revenue or expenses collected or incurred after December 31, 2001, for rate-regulated service provided during the period in January 2002, while customers were transferred to retail providers.

---

[9] "'Affiliated power generation company' means a power generation company that is affiliated with or the successor in interest of an electric utility certificated to serve an area." TEX. UTIL. CODE ANN. § 31.002(1).

8

The Commission, the Cities, and TIEC all assert that, by not specifically using "December 31, 2001" in section 39.202(c), the legislature recognized that not all customers would be provided with customer choice at midnight on December 31, 2001, and that by using the more ambiguous phrase "the day before customer choice is introduced," the legislature intended for revenues and expenses received or incurred after December 31, 2001 to be included in the final fuel reconciliations. Even if all customers had used the special meter read program, the record contains no evidence that every TCC customer could have had his final meter read at 12:00 am on January 1, 2002. Such information reinforces the Commission's interpretation of the legislative intent behind using the phrase, "the date customer choice is introduced." Giving appropriate deference to the Commission's interpretation of the statutes it was created to enforce, we agree with the Cities, the Commission, and TIEC.

Reading the statute as a whole,[10] we see that the legislature could have used "December 31, 2001" in section 39.202(c) had it intended for that date to be the end of the period. *Compare* TEX. UTIL. CODE ANN. § 39.102(b) (Vernon 2007), *and id.* § 39.202(b), *with id.* § 39.107(a) (Vernon 2007 & Supp. 2008) ("On introduction of customer choice . . . ."), *and id.* § 39.154(a) ("[O]n the date of introduction of customer choice . . . ."), and *id.* § 39.201(I) ("[A]fter customer choice is introduced . . . ."). By using the imprecise phrase, "the date customer choice is introduced," the legislature left interpreting section 39.202(c) to the Commission. *Id.* § 39.202(c); *see generally Meno v. Kitchens*, 873

---

[10] *See Trawalter v. Schaefer*, 142 Tex. 521, 179 S.W.2d 765, 767 (Tex. 1944); *Hartford Ins. Co. v. Cain*, 246 S.W.3d 374, 378 (Tex. App–Austin 2008, no pet.) ("In construing a statute, we must ascertain the legislative intent by looking to the entire act, including the caption and body.").

9

S.W.2d 789, 791 (Tex. App.–Austin1994, writ denied) (noting that, "if the meaning of the section or statute in question is not clear," deference to the Commission's interpretation is appropriate).

The Commission determined that, by requiring a "final" fuel reconciliation, the legislature intended for each of the formerly-regulated utilities to reconcile all of its costs and revenues for its bundled services, even those incurred or received after December 31, 2001. Surely the legislature did not intend for costs and revenues from a utility's bundled services to remain unreconciled after the *final* fuel reconciliation.[11] Had the Commission used the interpretation urged by TCC, the *final* fuel reconciliation would have left unreconciled $43,429,462.00 in revenues billed in 2002 for energy consumption both before and after December 31, 2001, and $10,591,133.00 in expenses incurred in 2002 for bundled, regulated service provided after December 31, 2001. The Commission's interpretation "protects the public interest" by ensuring that in the *final* fuel reconciliation, *all* costs and revenues incurred during the reconciliation period and associated with rate-regulated services were reconciled so that TCC did not receive a windfall by including costs in its reconciliation but not revenues. *See id.* § 39.001(a). The Commission's interpretation is reasonable, does not contradict the plain meaning of the statute, and in fact, promotes the statute's purpose. *See generally Tarrant Appraisal Dist.*, 845 S.W.2d at 823; *Steering Comms.*, 42 S.W.3d at 300. We overrule TCC's first issue.

## D.    TCC's Second Issue:  Violation of the Fuel Rules

---

[11] *See generally State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006); *CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities*, No. 03-06-00285-CV, 2008 WL 2852336, at *9 (Tex. App.–Austin July 25, 2008, pet. filed) ("Our primary objective in statutory construction is to give effect to the legislature's intent.").

Similarly, TCC argues that the Commission erroneously interpreted its own rules to extend the reconciliation period beyond December 31, 2001. Utilities were required by rule to account for revenues and expenses incurred "during the reconciliation period." 16 TEX. ADMIN. CODE § 25.236(d)(1). TCC complains that in prior reconciliations, the Commission defined the reconciliation period as a single month. According to TCC, the change in methodology allowed the Commission to reconcile expenses incurred in December 2001 with revenues billed in December 2001 and revenues billed in a subsequent month. TCC asserts that this action resulted in a mismatch "between the items reconciled, resulting in a longer time period of revenues than expenses being 'reconciled.'"

TCC concedes, as it must, that the "the reconciliation period" is not defined by the rule. Thus, we must determine whether the Commission reasonably interpreted its fuel rule. *See* 16 TEX. ADMIN. CODE § 25.236; *Gulf States Util. Co.*, 809 S.W.2d at 207 (requiring deference to the Commission's construction of its own rules, so long as its construction is reasonable). Without designating a specific date for the end of the reconciliation period, the legislature required final fuel reconciliations for the period ending the day before customer choice was introduced. *See* TEX. UTIL. CODE ANN. § 39.202(c). As we held in deciding TCC's first issue, the Commission reasonably interpreted section 39.202(c) to include the period during which TCC's customers were switched to retail providers. Likewise, the Commission's interpretation of its own rule is reasonable.

The Commission recognized not only that "[n]ormal billing lag occurs between when a cost is incurred and when that cost is billed and collected," but also that the legislature directed it to conduct a final fuel reconciliation. *Id.* In prior reconciliations, costs incurred in the final month of the reconciliation period and billed in the first months of the next

11

reconciliation were accounted for in the subsequent reconciliation. Because there are no more reconciliations, the Commission reasonably interpreted the legislature's command to conduct a final reconciliation by accounting for all revenues associated with the costs of providing service during the reconciliation period. *See id.* TCC's second issue is overruled.

### III. TCC ISSUE NO. 3: OFF-SYSTEM SALES MARGINS

In TCC's third issue, it argues that the Commission erred when resolving an issue related to sharing off-system sales margins with retail customers. "Off-system margins" are sales margins arising from a utility's sale of excess energy, generated beyond what its retail customers needed, that the utility sold to other customers. TCC argues: (1) the Commission exceeded its authority because, by requiring the margin sharing to account for months beyond the date of the final fuel reconciliation, the Commission extended the date of the final fuel reconciliation; and (2) the Commission's order contravenes an "Integrated Stipulations and Agreement" ("ISA"). We disagree with both contentions.

### A. Factual Background

Prior to deregulation, utilities would produce electricity to satisfy the needs of their retail customers. When the utility generated more electricity than its customers needed, it would sell the excess to other customers in a off-system sale. As a general rule, utilities were required to share ninety percent of their off-system sales margins with their retail customers through fuel reconciliations. 16 TEX. ADMIN. CODE § 25.236(a)(8).

As part of the AEP and Central and South West Corporation ("CSW")[12] merger, the Commission adopted the ISA, a settlement agreement entered into by TCC's predecessor and several other parties. The ISA required TCC to share the off-system margins with its retail customers for five years from the effective date of the merger. These margins were to be credited to the customers in the form of revenue credits in fuel reconciliation proceedings.

Subsection G of the ISA provides, in pertinent part:

3.G.    Off-System Sales Margins

(1)     [TCC] off-system sales margins up to $1.75 million shall be credited to customers. For any [TCC] off-system sales margins between $1.75 million and $2.62 million, 85% shall be credited to customers and 15% of such margin shall be retained by the shareholders. For any [TCC] off-system sales margins above $2.62 million, 50% of such margins shall be credited to customers and 50% of such margins shall be retained by the shareholders.
. . . .

(4)     The provisions as to off-system sales margins shall be in effect for a period of five years from the effective date of the merger.

. . . .

(6)     Off-system sales margins to be credited to customers under this subsection shall be made in the form of revenue credits in fuel reconciliation proceedings.

The merger was effective in July 2000, and this appeal involves the final fuel reconciliation for TCC that was filed in 2002. To account for the five-year period of margin-sharing under the ISA, the Commission took the total margin of off-system sales for the 18

_____

[12] CSW was the holding company of CP&L, TCC's predecessor. In a stock transaction, CSW merged into AEP, and as part of the merger process, the parties adopted the ISA as a compromise on many issues including the present, contested issue.

13

months before TCC's final fuel reconciliation, when the margin-sharing was in effect under the ISA, divided that total by 18 to get a monthly average or proxy, and multiplied that proxy by 60 months to represent the full five years of sharing required by the ISA. The total dollar figure of off-system margins owed by TCC, according to this formula, was approximately $52.8 million, the amount the Commission concluded was reconcilable.

## B.    Did the Commission Properly Construe the ISA?

TCC raises the issue of whether the Commission may include, in the present fuel reconciliation, expenses incurred beyond December 31, 2001. TCC argues that by requiring it to fulfill the five-year margin sharing in the ISA, the Commission is improperly extending the reconciliation period by 42 months. As we noted *supra* Part II, the legislature tasked the Commission with conducting a final fuel reconciliation. The Commission properly interpreted this mandate by insisting that TCC reconcile the margin-sharing it committed to in the ISA.

Additionally, section 39.108, commands that chapter 39 of the utility code may not "interfere with or abrogate the rights or obligations of any party, including a retail or wholesale customer, to a contract with an investor-owned utility . . . ." TEX. UTIL. CODE ANN. § 39.108(1) (Vernon 2007). Thus, section 39.108 required the Commission to give effect to the parties' agreement embodied in the ISA, regardless of chapter 39's final fuel reconciliation proceedings. The question before us, then, is one of contract interpretation.

### 1.    Standard of Review:  Contract Interpretation

Determining whether an agreement is ambiguous is a question of law which we review de novo. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d

587, 589 (Tex. 1996). The interpretation of an unambiguous agreement is also a question of law reviewed de novo. *Weslaco Fed'n of Teachers v. Tex. Educ. Agency*, 27 S.W.3d 258, 263-64 (Tex. App.–Austin 2000, no pet.). If the agreement is ambiguous, a fact issue is created regarding the parties' intent. *See Cities of Abilene v. Pub. Util. Comm'n of Tex.*, 146 S.W.3d 742, 748 (Tex. App.–Austin 2004, no pet.). If the agreement is ambiguous, we will affirm the Commission's interpretation of it, so long as the interpretation is supported by substantial evidence. *Id.*

The Commission may resolve a dispute arising from the interpretation of a settlement agreement adopted into a final order in a previous administrative proceeding. *In re Entergy Corp.*, 142 S.W.3d 316, 324 (Tex. 2004). The Commission may not, however, use this power to amend the prior order that adopted the agreement. *Cities of Abilene*, 146 S.W.3d at 747 n.7 (citing *R.R. Comm'n v. Home Transp. Co.*, 670 S.W.2d 319, 325 (Tex. App.–Austin 1984, no writ)). The Commission must use the rules of contract interpretation to interpret a settlement agreement previously adopted. *Id.* at 747.

Under the rules of contract interpretation, the primary duty of the Commission is to "ascertain and give effect to the parties' intentions as expressed in the document." *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311 (Tex. 2005). The Commission should attempt to "harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement." *Id.* An oppressive, unreasonable, and inequitable construction should be avoided, if possible. *Id.* The agreement should be construed from "'a utilitarian standpoint bearing in mind the particular business activity sought to be served.'" *Id.* (quoting *Reilly v. Rangers Mgmt., Inc.*, 727

15

S.W.2d 527, 530 (Tex.1987)).  After applying the rules of interpretation, if the agreement can be given a certain or definite legal meaning, it should be construed as a matter of law because it is unambiguous.  *Id.*  If the agreement can reasonably be interpreted in more than one way, it is ambiguous.  *Id.*

### 2.    Analysis

TCC argues that the agreement is ambiguous on the post-deregulation effect of subsection G(6), which requires that margins be shared with the utility's customers through fuel reconciliations.  TCC argues that after deregulation, there is no way to fulfill the express provision of G(6) because post-deregulation, fuel reconciliations do not exist.  On the other hand, the Commission and the Cities allege that the intent of the parties to the ISA is clear and unambiguous:  the ISA contemplated a sharing of off-system sales margins for five years.  They also assert that this commitment to margin-sharing is independent of the method by which the margins would be shared.  TCC counters by arguing that subsections 3(G)(1) and 3(G)(6) cannot be independent of each other because off-system sales margins have always been shared through fuel reconciliations.

We find, as did the Commission in Docket No. 26000,[13] that the ISA is unambiguous as a matter of law.  *See generally Cities of Abilene*, 146 S.W.3d at 748.  The mere fact that there are two or more interpretations advanced does not lead automatically to the conclusion that the agreement is ambiguous.  *AT&T Corp. v. Rylander*, 2 S.W.3d 546, 560 (Tex. App.–Austin 1999, pet. denied) ("Not every difference in the interpretation of a

---

[13] *Application of West Texas Utilities for Authority to Reconcile Fuel Costs*, Docket No. 26000, Order on Rehearing at 7 (10/18/2004) (affirming, in a fuel reconciliation involving TCC's sister company, that the ISA is unambiguous) *available at* http://interchange.puc.state.tx.us (last visited 12/15/2008).

contract creates an ambiguity. The mere disagreement over the meaning of a particular provision in a contract does not make it ambiguous."). We look at the circumstances present at the time the agreement was made when determining whether the agreement is ambiguous. *Weslaco Fed'n of Teachers*, 27 S.W.3d at 264.

The intent of the parties to share off-system sales margins for five years is clear and subject to only one reasonable interpretation. Subsection 3(G)(4) clearly requires five years of sharing: "[t]he provisions as to off-system sales margins shall be in effect for a period of five years from the effective date of the merger." The off-system sales margins are shared through a fuel reconciliation, and that is what occurred in this case through the use of the proxy. The interpretation urged by TCC, that because there are no more fuel reconciliations, there should be no more off-system margin sharing, leads to an unreasonable result that is contrary to the plainly expressed intent of the parties.[14] We overrule TCC's third issue.

## IV. TCC's Fourth Issue: The Docket Number 25755 Load-Forecasting Settlement

In its fourth issue, TCC asserts error in the Commission including, as a reduction to TCC's fuel expenses, a distribution received under Docket No. 25755.[15] TCC alleges that the Commission treated TCC and its sister company, AEP-Texas North Company ("TNC"), differently, thereby acting arbitrarily and capriciously. *See* Tex. Gov't Code Ann. § 2001.174(2)(F) (2008).

---

[14] See *West Texas Utilities*, Docket No. 26000 at 7 ("The fact that margin-sharing credits are to be made in the form of revenue credits in fuel reconciliation proceedings does not limit the requirement to share five years of off-system sales margins.").

[15] *See PUC Investigations of Overscheduling in ERCOT in August, 2001*, Docket No. 25755 *available at* http://interchange.puc.state.tx.us (last visited 12/15/2008).

## A. Factual Background

The Electric Reliability Council of Texas ("ERCOT") operates Texas's electric production and transmission grid. *BP Chemicals, Inc. v. AEP Texas Central Company*, 198 S.W.3d 449, 451 (Tex. App.–Corpus Christi 2006, no pet.); *see* TEX. UTIL. CODE ANN. § 39.151 (Vernon 2007). The ERCOT grid is divided into different zones with different utilities being responsible for serving loads in the different zones. "Load" is the amount of power being used by consumers at any given time. This grid system ensures that there is an even amount of power being distributed to a specific zone to meet the demand of consumers in that zone.

Using a variety of data, a Qualified Scheduling Entity ("QSE")[16] would submit a "balanced schedule" for each of the utilities servicing ERCOT. A "balanced schedule" is one where the total amount of power supplied to the grid equals the total amount of power required by end-users for the same time period. TCC's QSE is named "AEPSC." When the amount of power actually consumed was more than the amount scheduled in that zone, ERCOT would buy power from another supplier to fill the need. ERCOT would then charge the under-forecasting utility the amount paid to cover the shortfall.

Docket No. 25755 resulted from the Commission's investigation into potential load over-scheduling in ERCOT. In Docket No. 25755, the Commission determined that costs among the utilities serving ERCOT had been inaccurately allocated. The QSEs settled with ERCOT and agreed to remit to ERCOT amounts that had been over-allocated.

---

[16] "A market participant that is qualified by the Electric Reliability Council of Texas (ERCOT) in accordance with Section 16, Registration and Qualification of Market Participants of ERCOT's Protocols, to submit balanced schedules and ancillary services bids and settle payments with ERCOT." 16 TEX. ADMIN. CODE § 25.5(95).

ERCOT would then allocate the funds properly and distribute the appropriate amounts back to the utilities. A remittance to ERCOT represented a return of previously-collected revenues, and a distribution from ERCOT was crediting already-incurred expenses.[17]

On behalf of the AEP ERCOT operating companies—TCC and TNC— AEPSC was required to remit over $3 million to ERCOT. TNC remitted over $2 million to ERCOT. Then in TNC's final fuel reconciliation, the Commission did not require TNC to recognize the remittance it made to ERCOT, which should have resulted in a decrease in TNC's revenues.

In contrast, in recognition of Docket No. 25755, TCC received a distribution of over $1 million. The Comission required this distribution to be credited against TCC's fuel expenses in the present reconciliation. TCC alleges that the Commission has acted arbitrarily and capriciously by requiring TCC to reconcile the amount received from the ERCOT distribution, which decreases the amount of expenses TCC may recognize. TCC argues that this disparate treatment—requiring TCC to reduce its expenses but not requiring TNC to decrease revenues—is an arbitrary and capricious action by the Commission causing an unreasonable result.

## B.  Standard of Review:  Arbitrary and Capricious

An agency acts in an arbitrary and capricious manner when it (1) fails to consider a factor the legislature required it to consider; (2) considers an irrelevant factor; or (3) considers only relevant factors, yet reaches an unreasonable result. *See City of El Paso*

---

[17] The terminology in this process may be confusing, so for the sake of clarity, we will use "remittance" to reflect money returned to ERCOT by the QSEs and "distribution" when discussing money sent from ERCOT to the utilities. Therefore, a "distribution" is the proper allocation of the money remitted to ERCOT by the QSEs.

*v. Pub. Util. Comm'n of Texas*, 883 S.W.2d 179, 184 (Tex. 1994). Additionally, when the agency fails "to follow the clear, unambiguous language of its own regulation," it acts arbitrarily and capriciously. *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 185 S.W.3d at 564.

## C.    Analysis

TCC claims that Docket No. 25755 either created obligations or it did not. TCC asserts Docket No. 25755 did not create them in one company while creating them in the other. The Commission counters by demonstrating that the difference results from the different treatment of expenses and revenues in a fuel reconciliation. In a fuel reconciliation, revenues are counted upon receipt, but expenses must be proven necessary and reasonable. 16 TEX. ADMIN. CODE § 25.236(d)(1)(A), (C). In TNC's final reconciliation, the Commission determined that TNC "failed to meet its burden of proving $2,704,246 [ ] in expenses associated with ERCOT over-scheduling, arising from the settlement in Docket No. 25755, were reasonable and necessary expenses incurred to provide reliable electric service to retail customers."[18] The Commission disallowed TNC's request to reconcile as expenses the remittance to ERCOT. In contrast, in TCC's final reconciliation, the Commission held that the distribution from ERCOT must be included in TCC's fuel reconciliation. We hold that the Commission did not act arbitrarily by treating the revenues and expenses differently. The Commission, pursuant to its fuel rules, reached a reasonable result in the present case by requiring TCC to include in its fuel reconciliation the distribution it received from Docket No. 25755. We overrule TCC's fourth issue.

---

[18] See *West Texas Utilities*, Docket No. 26000, Order on Rehearing at 26, Conclusion of Law No. 16.

## VI. TCC's Fifth Issue: Replacement Power Costs

In its fifth issue, TCC challenges the Commission's decision to disallow the inclusion of replacement power costs incurred during a shut-down of TCC's South Texas Project ("STP"), a nuclear power plant.

### A. Background

Westinghouse, a third party vendor, sold generators to STP that were placed into service beginning in 1988. According to TCC, Westinghouse claimed the generators were supposed to perform for 40 years. In 2000, TCC shut down STP to replace four of the steam generators manufactured by Westinghouse. The replacement occurred 12 years after they were placed into service.

Deteriorating tubes caused the need for replacement. According to William R. Jacobs, the Cities' witness, a leak in a steam generator tube is "a serious problem because it allows the high pressure, radioactive reactor coolant from the primary side to enter the non-radioactive secondary side of the plant." TCC, and the other owners of STP, sued Westinghouse, alleging that Westinghouse had "acted knowingly or recklessly, without due regard for the rights of others."[19]

The STP shut down caused an outage during the replacement period, and TCC purchased additional power to cover that lost during the shut-down. According to the Commission, TCC did not act imprudently. However, the Commission determined that Westinghouse acted imprudently, and it imputed Westinghouse's imprudence to TCC. The Commission found that "Westinghouse's sale of highly defective critical equipment that did

---

[19] TCC and Westinghouse reached an undisclosed settlement.

21

not achieve a reasonable level of performance, coupled with what TCC asserts were knowing or reckless misrepresentations, constituted imprudence." The Commission decreased TCC's eligible fuel expenses by $7.8 million, "a reasonable estimate of the portion of the total replacement-power costs for this outage attributable to the replacement of the steam generators."

TCC attacks the Commission's decision in three ways. First, TCC argues that the Commission improperly considered TCC's allegations in its lawsuit against Westinghouse as admissions in the present case. Second, TCC asserts that there is no evidence that Westinghouse was imprudent. Third, TCC alleges that the Commission failed to follow its enabling statute and rules by placing the burden of the expense onto TCC through standards applicable to base-rate proceedings and not to fuel reconciliation proceedings.

## B.    Standard of Review:  Substantial Evidence

Generally, we review the Commission's final orders under the substantial evidence rule. TEX. UTIL. CODE ANN. § 15.001 (Vernon 2007); TEX. GOVT. CODE ANN. § 2001.174 (Vernon 2008); *see Nucor Steel v. Pub. Util. Comm'n of Tex.*, 168 S.W.3d 260, 267 (Tex. App.–Austin 2005, no pet.). Under the substantial evidence rule, we must uphold the Commission's decision if a reasonable basis exists in the record for the decision, even if the evidence preponderates against the decision. *See Tex. Health Facilities Comm'n v. Charter Med.-Dallas Inc.*, 665 S.W.2d 446, 453 (Tex. 1984). While presuming that the Commission's order is valid and that "its findings, inferences, conclusions, and decisions are supported by substantial evidence," we also "give significant deference to the [Commission] in its field of expertise." *State v. Pub. Util. Comm'n of Tex.*, 246 S.W.3d 324,

22

331 (Tex. App.–Austin 2008, pet. filed). As the complaining parties, TCC and the Cities have the burden of overcoming our presumptions regarding the Commission's order. *Id.* at 332.

On questions falling under the Commission's discretion, we will not substitute our judgment on the weight of the evidence. *Id.* at 332. We will, however, consider the entire record to determine whether the evidence is such that reasonable minds could have reached the same conclusion that the Commission, to issue its order, must have reached. *Id.* at 332. If that is the case, we will affirm the Commission's decision. *Id.* at 332. "[I]f the decision is not reasonably supported by substantial evidence, in violation of a constitutional or statutory provision, in excess of the [Commission's] statutory authority, made through unlawful procedure, affected by other error of law, arbitrary or capricious, or characterized by an abuse of discretion," we will reverse the Commission's Final Order. *Id.* at 332 (citing TEX. GOV'T CODE ANN. § 2001.174(2)(A)-(F).

## C.     The Commission's Rules and Precedent

A utility is permitted to recover its reasonable and necessary expenses. *See* 16 TEX. ADMIN. CODE § 25.236(d)(1)(A); *Cities of Abilene*, 146 S.W.3d at 746. To be a reasonable and necessary expense, the cost must have been prudently incurred. *See Gulf States Utils. Co. v. Pub. Util. Comm'n of Tex.*, 841 S.W.2d 459, 466 *(*Tex. App.–Austin 1992, writ denied). Under Commission precedent, costs incurred due to the imprudence of a third-party vendor are not reasonable and necessary.[20] The imprudence of a third-

---

[20] See *Application of Texas Utilities Electric Company for Authority to Change Rates*, Docket No. 9300, 17 P.U.C. Bull. 2057, 1991 WL 790285, at *473, Conclusion of Law No. 34 (Sept. 27, 1991).

party vendor may be imputed to the utility, even if the utility has not acted imprudently.[21]

"By virtue of the fact that they paid [TCC's] base rate costs during the reconciliation period, [TCC's] ratepayers are entitled to a reasonable level of performance from the resources that gave rise to those base rate costs."[22]

## D. Analysis

### 1. Admissions

The Commission considered TCC's pleadings from its suit against Westinghouse as evidence of Westinghouse's imprudence. "Pleadings in another case that are inconsistent with a party's position in a present action are quasi-admissions, which are treated as some evidence." *Daimler-Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 718 (Tex. App.–Austin 2000, pet. dism'd w.o.j.) (citing *Dowelanco v. Benitez,* 4 S.W.3d 866, 871 (Tex. App.–Corpus Christi 1999, no pet. h.)). However, when certain conditions are met, quasi-admissions can become formal judicial admissions.[23] *Id.* at 719. The Commission argues that TCC's pleadings in the suit against Westinghouse amount to

---

[21] *Id.*

[22] *Application of Texas Utilities Electric Company for the Reconciliation of Fuel Costs*, Docket No. 15195, Final Order at 10 (Aug. 26, 1997)*available at* http://interchange.puc.state.tx.us (last visited 12/15/2008).

[23] The conditions are as follows:

(1) the statements relied on were made during the course of a judicial proceeding; (2) the statements are contrary to an essential fact embraced in the theory of recovery or defense asserted by the person making the statements; (3) the statements were deliberate, clear, and unequivocal; (4) giving conclusive effect to the statements will be consistent with the policy on which the rule is based; and (5) the statements are not also destructive of the opposing party's theory of recovery.

*Daimler-Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 718 (Tex. App.–Austin 2000, pet. dism'd w.o.j.).

formal judicial admissions.[24]  Under the substantial evidence standard of review, we do not need to decide whether TCC made a formal judicial admission via its pleadings in its lawsuit against Westinghouse.  It is enough that TCC's pleadings in the lawsuit against STP—where TCC claimed Westinghouse acted recklessly—amount to some evidence, forming a reasonable basis in the record for the Commission's conclusion that Westinghouse acted imprudently.  *See generally Charter Med.-Dallas Inc.*, 665 S.W.2d at 453.

### 2.    Westinghouse's Imprudence

TCC asserts that there is no evidence that Westinghouse was imprudent. Prudence, in this context, means

> [T]he exercise of that judgment and the choosing of one of that select range of options which a reasonable utility manager would exercise or choose in the same or similar circumstances given the information or alternatives available at the point in time such judgment is exercised or option is chosen.

*Entergy Gulf States, Inc. v. Pub. Util. Comm'n of Tex.*, 112 S.W.3d 208, 210 n.2 (Tex. App.–Austin 2003, pet. denied).  TCC claims that the Commission, contrary to the prudence standard, evaluated Westinghouse's actions using hindsight.  *See id.*  The Commission responds that it based its finding of imprudence on the specific representations and warranties Westinghouse made when it sold the generators to STP and that by doing so, it did not make its findings using hindsight.  In adopting the ALJs' decision, the Commission concurred with their findings that "Westinghouse designed and

---

[24] A formal judicial admission is binding on the party admitting it, and he may not introduce contradictory evidence.  *See Cameron County v. Velasquez*, 668 S.W.2d 776, 782 (Tex. App–Corpus Christi 1984, writ ref'd n.r.e.) (discussing the differences between formal judicial admissions and quasi-judicial admissions).

25

supplied steam generators so defective they performed for only a fraction of their anticipated duration" and that "Westinghouse seriously misrepresented the performance that could have been expected from the steam generator tubes." Dr. William R. Jacobs, a witness for the Cities, testified that "[t]he steam generators supplied to STP were flawed and lasted only a fraction of their intended life." This provides a reasonable basis in the record upon which the Commission based its determination that Westinghouse, and thus TCC, was imprudent. *See generally Charter Med.-Dallas, Inc.*, 665 S.W.2d at 453 (setting forth the substantial evidence rule).

### 3. Base-Rate Standards vs. Fuel Reconciliation Standards

The crux of TCC's third argument is that the Commission erred as a matter of law by following factors applicable to base-rate proceedings[25]—risk allocation and equity—and not the fuel reconciliation standard[26] applicable to this proceeding. However, the Commission followed its fuel rule as it determined that the expenses were not "reasonable and necessary." *See* 16 TEX. ADMIN. CODE § 25.236(d)(1)(A).

Docket No. 15195 is instructive.[27] In that fuel reconciliation, the Commission had to determine who bears the fuel replacement costs associated with an extraordinary outage at a generation plant. The Commission determined that because the ratepayers continued to pay the utility's base rates during the extraordinary outage, the ratepayers should not bear the burden of the fuel replacement costs, even absent a finding of utility imprudence.[28]

---

[25] *See* TEX. UTIL. CODE ANN. §§ 36.051-.052 (Vernon 2007).

[26] *See* 16 TEX. ADMIN. CODE § 25.236(d)(1)(A).

[27] *See Texas Utilities Electric Company*, Docket No. 15195, Final Order at 10 (Aug. 26, 1997).

[28] *Id.* at 9.

26

Significantly, to make this determination, the Commission used the risk allocation and equity factors.[29]  In the present case, the Commission properly followed its enabling statute, its rules, and its precedent.  *See Nucor Steel v. Pub. Util. Comm'n of Texas*, 26 S.W.3d 742, 748 (Tex. App.–Austin 2000, pet. denied) (noting that reviewing courts defer to the agency's interpretation of its own rule unless the interpretation is inconsistent with the rule or plainly erroneous, and affirming that the "'prudence' standard explicitly incorporates a utility's reasonableness and, by speaking in terms of available alternatives, implicitly recognizes that an expense must be necessary").  Accordingly, we overrule TCC's fifth issue.

## VII.  TCC's Sixth Issue and the Cities' First Issue: Capacity Costs in Energy Purchases

In its sixth issue, TCC challenges the Commission's decision to disallow approximately $1.96 million of the costs of certain block energy contracts—also known as "purchased-power contracts."[30]  The Commission determined that the costs were implicit "capacity" costs that are typically not included as fuel expenses and are not recoverable under the Commission's fuel rule.  *See* 16 Tex. Admin. Code § 25.236(a)(4).  Capacity

---

[29] *Id.*  ("[F]rom an equity and risk allocation standpoint, the Commission concludes that the increased fuel costs associated with the extraordinary 19-month outage at MOSES Unit No. 3 should fall upon the shareholders of TUEC, even in the absence of a finding of imprudence.").

[30] Block energy purchases provide for a fixed amount of energy in specific, daily on-peak or off-peak hours to be delivered over a certain number of days.  As an example,

> [I]n a typical "5x16 purchase," a specified number of megawatts ("MW") is to be delivered during each 16-hour on-peak period on each of five weekdays.  The buyer under such a contract pays for the energy over the entire period specified, regardless of whether or not the buyer actually takes possession of the full block of energy.  These contracts are typically "financially firm" in that they include liquidated damages provisions.

Order on Rehearing at 26, Finding of Fact No. R7.

costs, generally, are those "costs associated with providing the capability to deliver energy (primarily the capital costs of facilities)." *Gulf States Utils. Co.*, 841 S.W.2d at 461; *City of El Paso*, 851 S.W.2d at 898 ("'Capacity costs' refer to one element of the price charged by a seller of electric power—an element that represents the seller's fixed costs in generating the power." Energy-only charges reflect "the seller's variable costs in generating the power—the cost of fuel, for example."). TCC asserts there is not substantial evidence to support this decision and that the Commission acted arbitrarily and capriciously.

Conversely, in their first issue, the Cities complain that the Commission did not go far enough in disallowing TCC's capacity costs. The Cities allege that the Commission erred by (1) failing to find certain purchases to contain capacity; (2) using an inaccurate method of quantifying the approximately $1.96 million of costs the Commission disallowed; and, in the alternative, (3) allowing an unreasonable price to be paid for the summer 2001 purchases, if those purchases are considered energy purchases without embedded capacity.

**A.      TCC's Sixth Issue: Whether the Commission Properly Included Capacity Costs in its Final Fuel Reconciliation**

**1.      Factual and Procedural Background**

*a.      Original Proceeding*

TCC requested that more than $75 million in purchased-power contracts be reconciled. The purchases at issue did not contain an explicit, separate charge for capacity. The ALJs originally concluded that $29.6 million of these expenses were implicit capacity costs and recommended their exclusion. The ALJs' original recommendation

quantified the implicit capacity costs using a method the Commission had rejected in El Paso Electric Company's fuel reconciliation.[31] The Commission declined to adopt the portion of the original proposal for decision recommending the exclusions and remanded this issue back to the ALJs.

### b. Remand Proceedings

The order on remand stated that the Commission could not determine whether "specific contracts or other documents contain language indicating that [TCC] was purchasing capacity" in any of its purchased-power contracts. On remand, the Commission instructed the ALJs to take additional evidence to determine whether TCC's purchased-power contracts contained implicit capacity, and if so, to quantify the costs so that they could be excluded from the final reconciliation.

### i. The Evidence on Remand

On remand, the ALJ received evidence primarily from three witnesses: Naim Hakimi, who at the time was the Director of Power Cost Recovery with AEPSC; Scott Norwood, on behalf of Cities; and Randall Falkenberg, for the Office of Public Utility Council. To evaluate this additional evidence, the ALJ was guided by the Commission's order on remand that directed the ALJ to Docket 26194[32] and alluded to the Commission's decision in *Entergy*.[33] As enunciated by the ALJ on remand, the factors she was to follow were:

---

[31] *See Petition of El Paso Electric Company to Reconcile Fuel Costs*, Docket No. 26194, Final Order (May 5, 2004) (finding improper a method of quantifying implicit energy costs that involved comparing firm energy contracts with the cost of providing power from a utility's least efficient generating plants) *available at* http://interchange.puc.state.tx.us (last visited 12/15/2008).

[32] *El Paso*, Docket No. 26194, Final Order (May 5, 2004).

[33] *Application of Entergy Gulf States, Inc. for the Authority to Reconcile Fuel Costs*, Docket No. 23550, Final Order (Aug. 2, 2002) *available at* http://interchange.puc.state.tx.us (last visited 12/15/2008).

(1)    in *El Paso*, a contractual definition of "firm power service" as including "firm capacity with reserves" and "capacity purchases";

(2)    in *El Paso*, that the utility purchased the power to serve native load and purchased additional power during the peak summer months of the contract;

(3)    in *Entergy*, internal meeting notes that state that the utility should "[l]ock in 'No Capacity Cost' options" and "[a]ttempt to restructure some proposals [for purchased power] to shift capacity costs to energy costs";

(4)    in *Entergy*, that the contracts at issue were found to contain a capacity component by the Louisiana Public Service Commission; and

(5)    in *Entergy*, the utility's admission that its more recent "energy-only" purchases contained a capacity component.

The ALJ summarized these factors by stating, "The Order on Remand . . . seems to focus primarily on the language used by the utility, and in particular whether the language of the contracts themselves or of other company documents mentions capacity."

ii.    Identifying the Contracts Containing Capacity Costs in 1999, 2000, and 2001

Hakimi asserted that the disputed purchases during 1999, 2000, and 2001 did not contain capacity costs and that when TCC purchased capacity during the reconciliation period, those costs were separated from energy-only purchases. Norwood and Falkenberg, on the other hand, discussed contracts by TCC they believed contained characteristics meeting some of the factors laid out by the Commission. They also provided TCC documents they claimed satisfied some of the factors as well.

Ultimately, Norwood made two alternate recommendations. First, he recommended a disallowance of $22.73 million, and in the alternative, he recommended a disallowance of $14.57 million. Both recommendations were quantified using a method in which he took

the explicit capacity charge—$11.625/kilowatt ("kW") month—under one of TCC's capacity contracts and used it as a proxy to determine the total embedded capacity costs in the contracts he urged contained capacity costs. The ALJ rejected Norwood's first proposal because it followed the same identification procedure previously rejected by the Commission. Norwood's second proposal identified seventeen contracts that contained capacity according to company documentation, one of the factors mentioned by the Commission.

Falkenberg's recommendations included three contracts for the summer of 1999. The ALJ found that the evidence presented by Falkenberg and Norwood, while disputed by Hakimi, supported the conclusion that these three contracts included implicit capacity costs.

Falkenberg then identified nine transactions in the spring of 2000, which he contended contained capacity costs. The ALJ rejected this characterization, as the evidence did not support a finding of embedded capacity and because many of the transactions were to replace power lost during the steam generator replacement at STP that had already been excluded by the Commission.

For the summer of 2000, Falkenberg identified two contracts, and Norwood recommended the same. However, on one of the contracts, Falkenberg and Norwood disagreed as to the amount of capacity purchased for TCC. The ALJ agreed with Norwood's identification of 100 MW as capacity purchased for TCC. With that adjustment, the ALJ found that both summer 2000 contracts contained embedded capacity costs.

For the summer of 2001, the ALJ did not agree wholesale with either Falkenberg's or Norwood's recommendations. However, the ALJ did find that four purchases, identified

31

by Hakimi, included capacity costs. In summary, the ALJ identified three contracts for the summer of 1999, two for summer 2000, and four for summer 2001 that included embedded capacity costs.

### iii. Quantifying the Capacity Costs

To quantify these capacity costs, the ALJ determined that the order on remand directed her to quantify the costs by following *El Paso*.[34] In *El Paso*, capacity costs were quantified using the Western Systems Power Pool price cap along with a general recommendation of a market-based approach.[35] In the instant case, there was no price cap, so the ALJ relied on Norwood's and Hakimi's recommendations which were both market-based—they looked at TCC's contracts that contained capacity in order to determine proxies by which to quantify capacity costs in the nine identified transactions. The ALJ ultimately followed, and the Commission adopted, Hakimi's proposed proxies of $1.53/kW month, $2.31/kW month, and $2.15/kW month for the years 1999, 2000, and 2001 respectively. The total disallowance adopted by the ALJ based on these proxies was $1,619,750. The Commission, in its order on rehearing, adopted these recommendations but amended the final tally to correct a "math error" asserted by TIEC. The amendments resulted in a proxy of $2.50/kW month for 1999 and $2.57/kW month for 2000, with $2.15/kW month for 2001 remaining the same. The resulting amount disallowed by the Commission was $1,962,750. TCC asserts that the findings of capacity and the quantification of the capacity are not supported by substantial evidence and are arbitrary

---

[34] *See El Paso*, Docket No. 26194, Final Order (May 5, 2004).

[35] *Id.* at 5, 29, Finding of Fact No. 17B (May 5, 2004).

and capricious. We disagree.

## 2. Standards of Review: Substantial Evidence & Arbitrary and Capricious

Under the substantial evidence rule, we must uphold the Commission's decision if a reasonable basis exists in the record for the decision, even if the evidence preponderates against the decision. *See Charter Med.-Dallas Inc.*, 665 S.W.2d at 453. An agency acts in an arbitrary and capricious manner when it (1) fails to consider a factor the legislature required it to consider; (2) considers an irrelevant factor; or (3) considers only relevant factors, yet reaches an unreasonable result. *See City of El Paso*, 883 S.W.2d at 184. Additionally, when the agency fails "to follow the clear, unambiguous language of its own regulation," it acts arbitrarily and capriciously. *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 185 S.W.3d at 564.

In a fuel reconciliation, a utility is prohibited from recovering capacity costs. 16 Tex. Admin. Code § 25.236(a)(4). The Commission is permitted to go beyond the express language of purchased-power contracts to determine whether embedded capacity costs are included in the expenses presented for reconciliation. *See Entergy Gulf States, Inc. v. Pub. Util. Comm'n of Tex.*, 173 S.W.3d 199, 211 (Tex. App.–Austin 2005, no pet.).

## 3. Analysis

Here, the Commission, through the proceeding on remand, received testimony indicating that nine purchased-power contracts included capacity costs. The Commission followed the ALJ's acceptance of the majority of Falkenberg's identification of capacity costs in contracts. The Commission is the sole judge of the weight and credibility of the witnesses, and we will not interfere with that role here. *See Reliant Energy, Inc. v. Pub.*

33

*Util. Comm'n of Tex.*, 153 S.W.3d 174, 203 (Tex. App.–Austin 2004, pet. denied); TEX. GOV'T CODE ANN. § 2001.174.  The evidence presented amounts to a reasonable basis in the record for the Commission's decision that the nine transactions included capacity costs and that these costs amounted to approximately $1.96 million.  *See generally Charter Med.-Dallas, Inc.*, 665 S.W.2d at 453 (setting forth the substantial evidence rule).

The legislature did not present the Commission with any factors for the Commission to use in determining whether the transactions included capacity costs nor by which the Commission could quantify those costs.  *See City of El Paso*, 883 S.W.2d at 184 (noting that an agency acts arbitrarily and capriciously by failing to follow factors the legislature mandates, following irrelevant factors, or reaching an unreasonable result).  The Commission's fuel rules do not contain a methodology by which capacity costs may be identified and quantified.  *See* 16 TEX. ADMIN. CODE § 25.236.  The Commission reached a reasonable result.  *See City of El Paso*, 883 S.W.2d at 184.  The Commission did not act arbitrarily and capriciously.

**B.  The Cities' First Issue: Whether the Commission Properly Included Certain Capacity Costs in TCC's Final Fuel Reconciliation**

The Cities' first issue is essentially TCC's sixth issue in reverse.  The Cities argue that the Commission violated Commission rule 25.236(a)(4) by including capacity costs in TCC's eligible fuel expense.  *See* 16 TEX. ADMIN. CODE § 25.236(a)(4).  The Cities claim that the violation occurred by either of two actions, taken by the Commission, that allowed capacity costs to be included in TCC's fuel reconciliation: (1) the Commission deprived the Cities of due process, or (2) the Commission's decision was arbitrary and capricious.  Ultimately, the Cities identify nine contracts from summer 2001 that the Commission found

34

to not include capacity and claim the Commission erred by imputing only approximately $1.96 million as capacity costs, none of which came from the nine contracts identified by the Cities.

**1. Standards of Review: Procedural Due Process & Arbitrary and Capricious**

In a contested-case hearing, a party's due process rights are violated when the agency fails to notify the parties of the grounds upon which the agency will rely in reaching a final decision. *Langford v. Employees Retirement Sys. of Tex.*, 73 S.W.3d 560, 566 (Tex. App.–Austin 2002, pet. denied). Also, "when an agency adopts new policy in the course of a contested-case hearing without giving the parties pre-hearing notice, the parties may be deprived of procedural due process." *Flores v. Employees Retirement Sys. of Texas*, 74 S.W.3d 532, 544 (Tex. App.–Austin 2002, pet. denied).

An agency acts in an arbitrary and capricious manner when it (1) fails to consider a factor the legislature required it to consider; (2) considers an irrelevant factor; or (3) considers only relevant factors, yet reaches an unreasonable result. *See City of El Paso*, 883 S.W.2d at 184. Additionally, when the agency fails "to follow the clear, unambiguous language of its own regulation," it acts arbitrarily and capriciously. *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 185 S.W.3d at 564.

**2. The Cities' Due Process Rights**

First, the Cities challenge the Commission's decision alleging it violated their due process rights "by failing to provide notice of a comprehensible standard to be used in identifying capacity purchases and abandoning, without explanation, prior Commission precedent." The Cities allege that, in its order on remand, the Commission failed to identify

a standard by which to identify capacity costs in a purchased-power contract.

The Commission, in its order on remand, set forth the grounds upon which the ALJ should determine whether any of TCC's purchased-power contracts contained embedded capacity costs. *See supra* Part VII.A. The Commission did not violate the Cities' due process rights by failing to notify the parties of the grounds upon which it would rely in determining whether any of TCC's purchased-power contracts contained capacity costs.

The Cities further assert that their due process rights were violated because the Commission did not "explain deviations from established policy or precedent." *See Flores*, 74 S.W.3d at 544-45 ("Courts, however, frequently require that an agency explain its reasoning when it 'appears to the reviewing court that an agency has departed from its earlier administrative policy or there exists an apparent inconsistency in agency determinations.'") (citing *City of El Paso*, 851 S.W.2d at 900). The Cities complain that the Commission offered no explanation for not using the "reliability and firmness of supply" standard the Cities allege was established in *Entergy*.[36] In its order on remand, the Commission referred the ALJ to *El Paso*, which was decided subsequent to *Entergy*.[37] In *El Paso*, the Commission found that a contract entered into by El Paso Electric Company contained capacity costs because the "contract contained language indicating that there was a capacity component," and because the "contract was for a long-term purchase and was made in advance as part of [El Paso Electric Company's] planning process designed

---

[36] See *Entergy*, Docket No. 23550, Order at 17-18, Finding of Fact 59A (Aug. 2, 2002).

[37] Compare *El Paso*, Docket No. 26194, Final Order (May 5, 2004); *Entergy*, Docket No. 23550, Order (Aug. 2, 2002).

to meet [its] resource needs for reliability."[38]  The Commission also specifically deleted the ALJ's Finding of Fact No. 27, which read, "A capacity, as opposed to an economic, purchase is characterized by a purchase price in excess of the fuel cost for generation and a need to ensure reliability or firmness of power to the utility's base load."[39]  By deleting Finding of Fact No. 27 in *El Paso*, the Commission indicated that "reliability and firmness of supply" is not the sole factor for determining whether a purchased power contract contains capacity costs as the Cities now imply.

By referring to both *Entergy* and *El Paso* in its order on remand, the Commission was not abandoning precedent or policy without explanation, as *El Paso* did not require a showing of "reliability and firmness of supply" in order to find embedded capacity in the purchased power contracts in that contested case.  Additionally, by directing the ALJ on remand to follow *El Paso* and *Entergy*, the Commission set forth the standard by which it would determine whether purchased-power contracts contain capacity costs.  The Cities' due process rights were not violated.

### 3.    Arbitrary and Capricious Action

Next, the Cities allege that the Commission acted arbitrarily and capriciously by failing "to exclude capacity costs associated with [TCC's] summer 2001 purchases."  The Cities identify nine contracts for the summer of 2001 and assert that these nine contracts took the place of contracts previously part of TCC's 2001 Power Supply Plan that were

---

[38] *El Paso*, Docket No. 26194, Final Order at 4.

[39] *Id.* at 7; Proposal for Decision, Finding of Fact No. 27 (Sept. 22, 2003).

"booked out."[40] According to the Cities, the booked out contracts contained capacity costs,

so by replacing the booked out contracts with the nine other contracts, TCC was still

acquiring capacity. Additionally, the Cities claim that "[t]hese contracts had the same

characteristics, same terms and provided the same reliability and firmness of supply as the

purchases considered to be capacity by the Commission."

In its order on remand, the Commission listed the factors by which the ALJ should

determine whether TCC's purchased power contracts contained capacity. The Cities

complain that the Commission reached an unreasonable result. Here, the Commission

and the ALJ on remand evaluated the summer 2001 contracts identified by the Cities and

determined that, based on the grounds listed in the order on remand, the contracts did not

contain capacity. As the ALJ on remand noted:

> Norwood and Falkenberg both relied on [TCC's] communication with the
> Commission as the relevant documentary evidence that the 425 MW were
> purchased in part as "capacity." However, while the purchases selected by
> Mr. Norwood were much like those booked out, it appears there is no direct
> link between that documentation and most of the 2001 contracts identified
> in Mr. Norwood's recommendation. Based on this evidentiary record, the
> ALJ is unable to find that the corporate documents indicate the transactions
> at issue were executed for "capacity" purposes.[41]

Because the evidence before the Commission did not indicate embedded capacity in the

nine contracts identified by the Cities, as measured on the grounds laid out in the order on

---

[40] A "booked out" transaction occurs when there are opposing buy-sell transactions. For example, A sells 100 MW to B and B sells 90 MW to A. Instead of A delivering all 100 MW to B and B delivering all 90 MW to A, the transactions are booked out, resulting in the transactions being treated as a sale of 10 MW from A to B. *Revised Public Utility Filing Requirements*, 67 FED. REG. 31,044; 31,062-63.

[41] *Application of Central Power and Light Company for Authority to Reconcile Fuel Costs*, Docket No. 27035, Proposal for Decision on Remand at 26 (Jan. 12, 2005).

remand, the Commission did not reach an unreasonable result.[42]  The Commission did not

act arbitrarily and capriciously.  The Cities' first issue is overruled.

## VIII. THE CITIES' SECOND ISSUE:  THE AMOUNT OF IMPUTED CAPACITY

The Cities argue, in their second issue, that the Commission erred in quantifying the

amount of imputed capacity found in the purchased-power contracts.  *See supra*, Part VII.

### A.    Background

The Commission adopted proxy capacity charges based on recommendations

provided by TCC.  The Commission used $2.50/kW month for 1999, $2.57/kW month for

2000, and $2.15/kW month for 2001.  The Cities claim these proxies are inappropriate

because they represented an average capacity charge over the course of each respective

year and not capacity charges for summer peak capacity that is more expensive.  The

Cities recommended using as a proxy a single, summer of 1999 contract wherein TCC paid

$11.625/kW month for capacity.  The ALJ on remand rejected this approach because it

reflected only one contract over the three year reconciliation period.  The ALJ decided that

even though the Cities' and TCC's approaches had "serious flaws," TCC's "represents the

most defensible approach, in that it reflects more than just a single contract from the three-

year period."

---

[42] Underlying the Cities' arguments in their first issue is a disagreement with the grounds for determining capacity costs identified in the Commission's order on remand.  We note that even the Commission has commented on the lack of clarity and variety of definitions surrounding "capacity." *See El Paso*, Docket No. 26194, Final Order at 4 (May 5, 2004).  Here, the Commission set forth the grounds it considered important in identifying capacity, and it followed those grounds in deciding to include or exclude certain costs.  "[The substantial evidence] standard affords great deference to the Commission's decisions on topics that the legislature has determined are within the agency's discretion. . . ." *Nucor Steel*, 168 S.W.3d at 267.  "'TEX. UTIL. CODE ANN. generally confers authority upon the Commission to regulate and supervise public utilities, to fix and regulate rates of public utilities, and to insure rates, operations, and services [ ] are just and reasonable to the consumers and to the utilities.'" *Id.* (citing *Pub. Util. Comm'n v. GTE-Sw, Inc.*, 901 S.W.2d 401, 407 (Tex.1995)).

**B.    Standard of Review:  Substantial Evidence**

Under the substantial evidence rule, we must uphold the Commission's decision if a reasonable basis exists in the record for the decision, even if the evidence preponderates against the decision.  *See Charter Med.-Dallas Inc.*, 665 S.W.2d at 453.

**C.    Analysis**

In the order on remand, the Commission directed the ALJ to quantify any capacity costs she found by using a method consistent with *El Paso*.[43]  In *El Paso*, the Commission adopted a proxy based on a price cap in place with WSPP and general market-based principles.[44]  All parties involved in this reconciliation agree that there is no ERCOT price cap in place similar to the WSPP price cap.  The ALJ on remand took a market-based approach in considering what proxy to use to quantify capacity costs.

Hakimi recommended the proxy numbers upon with the ALJ based her decision. He noted that the proxies reflect average capacity contract prices paid by TCC during the reconciliation period on contracts that expressly stated capacity costs.  Such evidence presents a reasonable basis in the record upon which the Commission could base its decision to use TCC's recommended proxies.  *See generally Collins v. Tex. Nat. Res. Conservation Comm'n*, 94 S.W.3d 876, 881 (Tex. App.–Austin 2002, no pet.) (discussing the substantial evidence rule).

The Cities, however, argue that the mere existence of substantial evidence is not enough, and they cite cases reflecting that some courts require a rationale between the

---

[43] *See El Paso*, Docket No. 26194, Final Order (May 5, 2004).

[44] *Id.*  Final Order at 5, 29, Finding of Fact 17B.

agency's decision and the fact.[45]  The rationale provided by the ALJ on remand and adopted by the Commission is that the proxies chosen by the Commission reflect capacity prices during the entire three years of the reconciliation period.  The ALJ and the Commission chose not to follow the Cities' recommended proxy as it reflected only one contract from 1999 and not any capacity prices during the rest of the reconciliation period.  Here, as the Cities requested, the Commission demonstrated a "rationale between the facts and the agency's decision."  The Cities' second issue is overruled.

## X. THE CITIES' THIRD ISSUE:  THE PRICE PAID FOR PURCHASED-POWER CONTRACTS NOT CONTAINING CAPACITY

By their third issue, the Cities make two arguments.  First, the Cities contend that the Commission failed to determine whether TCC paid a reasonable price for the purchased-power contracts not found to contain capacity.  *See supra*, Part VII.  Second, because some of the purchased-power contracts did not contain capacity costs, the Cities argue that the prices paid for the energy were unreasonable and unnecessary per se.  The Cities base this argument in the fact that the price paid for the energy in some of the contracts was higher than the cost of TCC generating that energy itself.

### A.    Did the Commission Fail to Rule on this Issue?

After the ALJs completed the original proposal for decision, the Commission remanded the case back for a determination on the capacity issue.  The ALJ on remand presented a proposal for decision on the remanded issues as those issues were

---

[45] In support of this proposition, the Cities cite the following cases:  *City of El Paso*, 883 S.W.2d at 184; *Flores*, 74 S.W.3d at 544-45; *Nat'l Assoc. of Indep. Insurers v. Tex. Dep't of Ins.*, 888 S.W.2d 198, 207 (Tex. App.–Austin 1992), rev'd on other grounds, 925 S.W.2d 667 (Tex. 1996); *Gulf States Utils. Co.*, 841 S.W.2d at 474-75; *Starr County v. Starr Indus. Svcs., Inc.*, 584 S.W.2d 352, 356 (Tex. App.–Austin 1979, writ ref'd n.r.e.)).

41

designated in the Commission's order on remand. The Commission adopted the ALJ's proposal for decision on remand with modifications not relevant to this issue.

In the Commission's order on rehearing, in which the Commission adopted the ALJ's decision on remand, Finding of Fact R13 lists the transactions in which the ALJ and the Commission found embedded capacity. The purchases about which the Cities complain were not on that list. In Finding of Fact R12 in the order on rehearing, the Commission also determined that most of "TCC's on-peak block purchases were made to supply system load and operating reserve requirements." Additionally, for these remaining transactions—included in eligible expenses—that the Cities argue are unreasonable, the Commission made Conclusion of Law 37: "During the reconciliation period, TCC's eligible fuel expenses, as modified by the findings of fact and conclusions of law, are reasonable and necessary expenses that were incurred to provide reliable electric service to retail customers pursuant to P.U.C. SUBST. R. 25.236(d)." Thus, contrary to the Cities' argument, the Commission has ruled on this issue.

## B.     Were the Prices Paid Unreasonable?

The Cities' argument that the prices paid were unreasonable and unnecessary per se is also unavailing. The basis of this argument is that a utility, acting reasonably, would not pay more for energy-only purchases than it would cost the utility to produce that energy itself. In *El Paso*, the Commission rejected such an argument.[46] In that contested case, the Commission noted such a "construct fails to account for [the utility] buying a pure

---

[46] See *El Paso*, Docket No. 26194, Final Order at 6 (May 5, 2004).

energy contract."[47] The Commission also stated that "the mere possibility of a pure energy purchase destroys [such a] construct, and thus undermines" the conclusion that a reasonable utility would not pay more for purchased energy than it would cost to produce that energy itself.[48]

The Cities also argue that if the Commission has determined that the prices paid were reasonable and necessary, it did so without any rationale or justification. The Cities cite to *City of El Paso*, in which the Austin Court of Appeals determined that through providing for judicial review of contested cases, the legislature "implies a power [in the reviewing court] to require the Commission to supply any reasons or explanations necessary for the reviewing court to understand the Commission's final order." *City of El Paso,* 851 S.W.2d at 900. In that case, the Austin Court of Appeals held that the Commission was required to provide a justification for the definition it gave to a certain term when that definition led to different results in two different proceedings before the Commission. *Id.* at 901.

In the present case, we need not require the Commission to go to such lengths. The Commission's order on rehearing clearly determined that those purchases not excluded for containing capacity costs were reasonable and necessary energy-only purchases. The Cities' third issue is overruled.

## XI. THE CITIES' FOURTH ISSUE: THE DEPARTMENT OF ENERGY OVERCHARGES

In their fourth issue, the Cities allege the Commission erred by not excluding

---

[47] *Id.*

[48] *Id.*

approximately $3.5 million in overcharges by the United States Department of Energy ("DOE").

## A.    Background

The DOE provided uranium enrichment services to the owners of STP, which includes TCC. During the contested case hearing, it was revealed that DOE had overcharged for these services. These overcharges occurred from 1986 through 1993 and had been charged to TCC's customers through the fuel factor in previous reconciliations. Because these expenses were incurred outside the present reconciliation period, the Commission reversed the ALJs' recommendation that the $3.5 million should be excluded from reconcileable expenses in TCC's final fuel reconciliation. TCC has sued DOE to recover the overcharges. Thus, the Commission also ordered that, should TCC recover anything in the lawsuit, the recovery should be placed into the nuclear decommissioning fund. *See generally* 10 C.F.R. § 50.75 (2008); TEX. UTIL. CODE ANN. § 39.205 (Vernon 2007); 16 TEX. ADMIN. CODE § 25.231(b)(1)(F); 16 TEX. ADMIN. CODE § 25.301.

The Cities argue that the expenses previously passed on to customers have now been determined to be unreasonable and unnecessary and therefore are not recoverable under the fuel rule. *See* 16 TEX. ADMIN. CODE § 25.236(d)(1)(A) (permitting recovery of only those expenses that are necessary and reasonable). Additionally, the Cities claim that the Commission acted without legal basis in deciding to require TCC to give any recovery it may receive from its lawsuit against DOE to the nuclear decommissioning fund. TCC counters by asserting that pending litigation should not be considered in a reconciliation proceeding.

**B.      Should the Pending Litigation be Considered in This Reconciliation?**

In *Houston Lighting & Power Co.*, the Texas Supreme Court held that, in a rate proceeding, pending litigation should not be considered. *Pub. Util. Comm'n of Tex. v. Houston Lighting & Power Co.*, 748 S.W.2d 439, 442 (Tex. 1987). The Commission followed this precedent in other reconciliation proceedings.[49] The Commission was required by law to not include pending litigation in this fuel reconciliation.

**C.      Are the Expenses Now Unreasonable and Unnecessary?**

The Cities assert that the expenses previously found to be reasonable and necessary are now acknowledged to be unreasonable and unnecessary. The Commission's rules dictate that only those expenses incurred during the reconciliation period are reconcilable in a fuel reconciliation proceeding. 16 TEX. ADMIN. CODE § 25.236(d)(2). The fact that these expenses occurred before the present reconciliation period is undisputed. Additionally, the Commission has previously ruled that issues reviewed and resolved in a prior proceeding cannot be revisited in a later proceeding.[50] Here, the Commission followed its precedent and refused to litigate expenses subject to review during a prior reconciliation period.

---

[49] *See Application of Gulf States Utils. Co. To Reconcile Its Fuel Costs, Establish New Fixed Fuel Factors, and Recover Its Underrecovered Fuel Costs*, P.U.C. Docket No. 10894, 19 P.U.C. Bull.1401, 1993 WL 655241 at *124, Finding of Fact No. 23 (Tex. P.U.C., Aug. 19, 1993) (Final Order) (deferring a decision on certain issues until concurrent litigation was concluded); *Entergy*, Docket No. 23550, Order at 15, 28, Finding of Fact No. 42, Conclusion of Law No. 7 (Aug. 2, 2002) (postponing a decision on certain issues until the outcomes of an insurance claim and a warranty claim were finalized).

[50] See *Application of Houston Lighting & Power Co. for Reconciliation of Fuel Costs*, P.U.C. Docket No. 10092, 1992 WL 814024, at *20, 39, Finding of Fact No. 12 (Tex. P.U.C., Feb. 18, 1992) (Examiner's Report) ("Having previously determined that the choice of the flame scanner design used in Parish and Limestone was prudent, the Commission is precluded by res judicata from reconsidering that issue in this case."); *Petition of General Counsel for a Fuel Reconciliation for Southwestern Public Service Co.*, P.U.C. Docket No. 9030, 1991 WL 790253, at *40, 42, Finding of Fact No. 16, Conclusion of Law No. 9 (Tex. P.U.C., June 3, 1991).

**D. Should Lawsuit Proceeds be Turned Over to the Nuclear Decommissioning Fund?**

Recognizing that, should TCC recover any amount in its lawsuit against DOE, that amount would represent overcharges already passed on to its customers, the Commission decided to require TCC to pass any recovery from the lawsuit over to the nuclear decommissioning fund. The Commission was correct in deciding, as mentioned above, that the present reconciliation is not the place for addressing whether such a still unrealized recovery should be credited to TCC's customers. The Cities counter, however, that the Commission should have, in this fuel reconciliation, credited to TCC's customers the amount it seeks in its lawsuit. The Cities argue that since this is the final fuel reconciliation for TCC, all fuel-related expenses should be reconciled. We agree with the Cities to the extent that the expenses were incurred during the reconciliation period. Here, however, the expenses were incurred prior to the reconciliation period. Additionally, the Commission was left with the decision of what to do should TCC recover in the lawsuit against the DOE. The Commission decided to order TCC to pass any recovery into the decommissioning trust fund. We agree with the Commission that this decision properly respects Commission precedent relating to reviewing matters that were the subject of prior proceedings and is a reasonable resolution to the potential double-recovery TCC would get should TCC win its lawsuit. *See Texaco Producing, Inc. v. Fortson Oil Co.*, 798 S.W.2d 622, 626 (Tex. App.–Austin 1990, no writ) (holding that under the substantial evidence doctrine, "[t]he reviewing court is concerned not with the correctness of the administrative order, but with its reasonableness.") (citing *Firemen's and Policemen's Civil Svc. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex.1984)). The Cities' fourth issue is overruled.

## XII. The Cities' Fifth Issue: Costs Associated with an Outage at STP

In their fifth issue, the Cities object to the Commission including, in reconcilable fuel expenses, the replacement costs associated with an outage at STP during May 2001.

### A.    Factual and Procedural Background

The outage at issue occurred when STP personnel connected a laptop to a "Hart adapter" used to monitor Feedwater Regulating Valves.  The personnel used the laptop to record data concerning the operation of these valves.  Before connecting the laptop, the personnel asked the vendor whether the adapter was polarity sensitive, and the vendor stated that polarity did not matter.  Initially, the personnel connected a laptop with a two-prong, AC adapter and successfully tested the adapter.  Then, the personnel connected a laptop with a three-prong AC adapter to perform the actual monitoring.  Essentially, the third prong shorted signal wires which then started a process culminating in the valve closing and the reactor tripping.  TCC incurred replacement power costs to cover the costs associated with this outage, and the ALJs recommended that TCC not recover these expenses, asserting that the approximately $800,000 was imprudently incurred.  The Commission overruled the ALJs, stating: "TCC STP personnel exhibited appropriate caution in asking the vendor about the polarity sensitivity of the Hart adapter and in running a test of the monitoring equipment."  The Cities allege that the Commission failed to properly apply the prudence standard.  Additionally, the Cities assert that the Commission acted arbitrarily and capriciously by failing to apply the Commission's standard, mentioned in Conclusion of Law No. 29, that "human error rarely shields the utility from responsibility."

47

**B.      Analysis**

A utility is permitted to recover its reasonable and necessary expenses.  *See* 16

TEX. ADMIN. CODE § 25.236(d)(1)(A); *Cities of Abilene*, 146 S.W.3d at 746.  To be a

reasonable and necessary expense, the cost must have been prudently incurred.  *See*

*Gulf States Utilities Co.*, 841 S.W.2d at 466.   Again, in this context, "prudence" means

> the exercise of that judgment and the choosing of one of that select range of options which a reasonable utility manager would exercise or choose in the same or similar circumstances given the information or alternatives available at the point in time such judgment is exercised or option is chosen.

*Entergy Gulf States, Inc.*, 112 S.W.3d at 210 n.2.   The prudence standard also

contemplates that

> [t]here may be more than one prudent option within the range available to a utility in any given context. Any choice within the select range of reasonable options is prudent, and the Commission should not substitute its judgment for that of the utility. The reasonableness of an action or decision must be judged in light of the circumstances, information, and available options existing at the time, without benefit of hindsight.

*Nucor Steel*, 26 S.W.3d at 752 (citing with approval the Commission's prudence standard

prohibiting reliance on hindsight).

As evidence of imprudence, the Cities point to reports prepared by TCC and filed

with the Nuclear Regulatory Commission ("NRC").  "In response to the reactor trip, an

Event Review Team was formed" that drafted the STP Condition Report 01-8043

("Condition Report").  The Condition Report, dated June 7, 2001 and submitted by TCC to

NRC, noted two root causes of the event.  One root cause was inadequate management

oversight and the other was that "[p]ersonnel did not recognize the laptop PC and Hart

adapter as test equipment with the potential to introduce a ground path" and "testing was

48

insufficient to detect the ground path." Significantly, the Condition Report noted that "[o]perating experience reviews did not find any cases where use of a laptop computer contributed to plant events." And, while "there have been numerous occasions where grounded test equipment has caused plant events," "[t]he use of a laptop was not considered as test equipment in regards to previous operating experience." The Condition Report also commented:

> The feedwater control valves are designated in the Master Equipment Database as non-safety related/not risk significant (NRS). 0PG03-ZA-0090 (Work Process Program) has minimal requirements for working on non risk significant Structures, Systems, and Components (SSC). *Because of this, planning for the job did not require detailed research. Also, because this was classified as "not risk significant", the job did not require a heightened level of management involvement.*

(emphasis added). Finally, the Condition Report also stated, "Operator actions were prudent and timely."

In the order on rehearing, the Commission noted that the use of documents, such as the Condition Report, to judge the prudence of STP personnel does not amount to an improper use of hindsight. This conclusion applied generally to all six power outages and one power reduction at STP that the Commission was evaluating under the prudence standard. *See* Order on Rehearing at 30, Conclusion of Law No. 28; *but see* Order on Rehearing at 22, Finding of Fact No. 76(c) (finding that "[n]o disallowance should be made in connection with [the outage caused by the laptop]"). However, regarding this specific outage, we believe the Condition Report does use improper hindsight in the manner the Cities use it to support their contentions. Based on the above-quoted statements, the Condition Report establishes that the STP personnel prudently consulted with the vendor regarding whether the adapter was polarity sensitive. The designation of the feedwater

49

control valves as "non-safety related/not risk significant" meant that "planning for the job did not require detailed research" and "did not require a heightened level of management involvement." In "light of the circumstances, information, and available options existing at the time," STP personnel and management acted prudently. *See Nucor Steel,* 26 S.W.3d at 752. As was also indicated in the quoted statements from the Condition Report, the outage was not caused by mere human error. The Cities' fifth issue is overruled.

### XIII. THE CITIES' SIXTH ISSUE: SPOT MARKET COAL PURCHASES

In their sixth issue, the Cities allege the Commission erred by allowing TCC to reconcile spot market coal purchases made in response to conditions at the Coleto Creek coal plant.

**A.      Factual Background**

Coleto Creek historically burned bituminous coal from South America and Colorado. In the 1990s, TCC constructed a facility at Coleto Creek, allowing it to burn coal from the Powder River Basin blended with the Colorado or South American coal. TCC purchased the bituminous coal under a long-term contract with Kennecott Energy Company ("Kennecott"). During late 2000 and early 2001, Coleto Creek experienced an operational condition that caused the plant to consume more Colorado coal than had been expected. Under the Kennecott contract, to purchase coal for 2001, TCC was required to specify the amount it would purchase in 2001 by April 1, 2000. The need to purchase additional coal was discovered after April 1, 2000, so TCC could not purchase additional coal under the Kennecott contract and was forced to seek additional coal on the spot market. Of the competitive bids TCC received, Oxbow Minings, Inc. provided the lowest delivered cost per

unit of power, and TCC acquired the needed coal from Oxbow.

## B.    Analysis

The Cities argue that TCC's customers should not be held responsible when operational conditions result in increased expenses.[51]  We agree with the Cities that ratepayers are entitled to a reasonable level of performance from the generation resources whose costs are included in the rates paid by the customers.[52]  We disagree with the Cities' assertion that we must go outside the prudence and substantial evidence standards when reviewing the Commission's decision in this instance.  The Cities cite three cases in support of their contention, and all three utilized the prudence standard.[53]

According to the Commission's order on rehearing, based on confidential testimony, the Commission found that TCC exceeded its targeted blend of 50% Colorado coal in total burning, lending credibility to TCC's assertion that the plant conditions necessitated additional use of Colorado coal.  TCC also experienced an unanticipated reduction in coal

---

[51] *See Texas Utilities Electric Company*, Docket No. 15195, Final Order at 9 (Aug. 26, 1997) (holding that due to the nature of the extraordinary 19-month outage, the utility's shareholders bear the burden of the expenses even absent a showing of imprudence).

[52] See *id.* at 10.

[53] See *id.* at 9-10 (noting that costs associated a 19-month outage caused by a chimney collapse were imprudent, but even if they were not, the Commission would still hold the utility's shareholders responsible for the costs of the "extraordinary" outage under an "equity and risk allocation standpoint"); *but see Application of Gulf States Utils. Co. To Reconcile ifs Fuel Costs, for Permission to Delay Requesting a Surcharge, or in the Alternative, for a Surcharge to Recover Under-Recovered Fuel Expense*, Docket No. 15102, Order at Rehearing at 4 (June 26, 1997) ("While the traditional application of the prudence standard is appropriate in this case, circumstances may dictate otherwise in the future, as long as the utility is given proper notice of what standard the Commission will employ.") *available at* http://interchange.puc.state.tx.us (last visited 12/15/2008).; *Application of Entergy Texas for Approval of its Transition to Competition Plan and the Tariffs Implementing the Plan, and for Authority to Reconcile Fuel Costs, to Set Revised Fuel Factors, and to Recover a Surcharge for Under-Recovered Fuel Costs*, Docket No. 16705, Second Order on Rehearing at 55, Finding of Facts 10-13 (Oct. 14, 1998) (holding that the utility had not shown the additional expenses were the "reasonable and necessary result of prudent changes" and therefore disallowing the increased expenses) *available at* http://interchange.puc.state.tx.us (last visited 12/15/2008).

inventory coinciding with its increased need for Colorado coal. As a result of these circumstances, TCC sought competitive bids and chose the one giving TCC the lowest cost. Marguerite C. Mills, Director, Regulated Oil & Gas Administration for AEPSC, testified that the conversion of the plant to burn the blended coal resulted in significant savings for the ratepayers. This evidence supports the Commission's conclusion that the Oxbow purchases were prudent, reasonable, and necessary. The Commission decided what testimony to credit and not credit, and we will not substitute our judgment for its judgment. *See* TEX. GOV'T CODE ANN. § 2001.174 (Vernon 2008). The Cities' sixth issue is overruled.

## XIV. Conclusion

Having overruled all of the issues presented by both TCC and the Cities, we affirm the ruling of the district court affirming the Commission's Order on Rehearing.

_____
GINA M. BENAVIDES,
Justice

Opinion delivered and filed this
the 22nd day of December, 2008.