TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00577-CV






Appellant, The City of El Paso// Cross-Appellant, El Paso Electric Company


v.


Appellee, Public Utility Commission of Texas// 

Cross-Appellees, El Paso Electric Company and The City of El Paso






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

D-1-GV-04-002026, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING





O P I N I O N



 El Paso Electric Company (EPE) and the City of El Paso (City) sued for
judicial review of a final order in a contested case, a fuel-reconciliation proceeding EPE had
initiated before the Public Utility Commission (Commission) in which the City had intervened. The
district court affirmed the Commission's order in full. Both the City and EPE have appealed. We
will affirm the district court's judgment.


BACKGROUND EPE is an investor-owned electric utility that provides generation, transmission, and
distribution service to retail and wholesale customers in west Texas, southern New Mexico, and
California. Because the Texas Legislature thus far has not extended retail competition to EPE's
service territory within this state, see Tex. Util. Code Ann. § 39.402 (West 2007), (1) the Commission
has continued to set EPE's retail electric service rates under traditional cost-of-service rate-making
principles. See generally id. §§ 36.001-.406 (West 2007 & Supp. 2010). Under these familiar
principles, simply described, the Commission sets a utility's retail electric service rates so as to
ensure that revenues are sufficient to cover the utility's projected reasonable and necessary future
operating expenses, plus provide a reasonable rate of return on the utility's invested capital. The
rates operate only prospectively, and the utility generally bears the risk that its actual operating
expenses will exceed the projections incorporated into the rate--and its retail customers the
corresponding risk that rates will "over-charge" relative to the utility's actual operating
expenses--until a new rate-making proceeding can be conducted. However, with regard to the
sometimes-volatile expenses utilities incur on fuel to generate power for sale or in purchasing power
at wholesale for resale (the latter are known as "purchased-power expenses"), there is greater
flexibility in adjusting rates to account for deviations between projections and actual expenses. The
component of a utility's rates that covers these types of expenses--known as the "fuel factor," as
distinguished from "base rates"--is essentially an interim or temporary rate subject to both periodic
adjustment and retrospective true-up proceedings to "reconcile" revenues and actual expenses
through refunds or surcharges to customers. See, e.g., Entergy Gulf States, Inc. v. Public Util.
Comm'n of Tex., 173 S.W.3d 199, 206 (Tex. App.--Austin 2005, pet. denied).

 EPE's most recent rate-making proceeding had been concluded by a 1995 agreed
order and stipulation (1995 Stipulation/Agreed Order) under which the utility's base rates were
frozen until August 2005, the utility was prohibited from circumventing the freeze by shifting costs
from base rates to reconcilable fuel costs, and its recovery of fuel costs was to be governed by the
version of the Commission's "fuel rule" that was in effect as of July 1, 1995. See 16 Tex. Admin.
Code § 23.23 (1995), repealed by 24 Tex. Reg. 4998 (1999) (hereinafter "Former Fuel Rule")
(current version at 16 Tex. Admin. Code § 25.236 (2010)). In 2002, EPE initiated a proceeding
to reconcile its eligible fuel expenses and revenues from its provision of service in Texas
between January 1, 1999, and December 31, 2001 (the "reconciliation period"). EPE claimed that
it had incurred a total of approximately $277 million in eligible fuel expenses in providing its
electric service in Texas during the reconciliation period. The City and several other parties
intervened. The Commission referred the matter to the State Office of Administrative Hearings for
a contested-case hearing before a pair of administrative law judges (ALJs).

 The central disputed issues relevant to this appeal concern the proper calculation of
EPE's eligible fuel expenses in light of three sets of requirements under the 1995 Stipulation/Agreed
Order and the Former Fuel Rule.


Capacity costs

 Included in the fuel expenses EPE claimed were approximately $147 million in
purchased-power expenses. The Commission staff, the City, and other intervenors argued that a
portion of these expenses had actually included "capacity" charges that were not recoverable
under the 1995 Stipulation/Agreed Order or the Former Fuel Rule. Although there is some debate
regarding the precise nature of a "capacity" charge or how it can be identified, as we will explain
below, in general the term has referred to a charge that recovers fixed costs of the wholesale seller
in making assets available to generate power, as distinguished from "energy" charges that recover
variable costs (e.g., fuel) incurred by the seller in generating the power itself. See City of El Paso
v. El Paso Elec. Co., 851 S.W.2d 896, 898 (Tex. App.--Austin 1993, writ denied) ("The term
'capacity costs' refers to one element of the price charged by a seller of electric power--an element
that represents the seller's fixed costs in generating the power. (Another element, denominated
'energy charges,' represents the seller's variable costs in generating the power--the cost of fuel,
for example)."); Gulf States Utils. v. Public Util. Comm'n of Tex., 841 S.W.2d 459, 461
(Tex. App.--Austin 1992, writ denied) (describing capacity costs generally as "costs associated with
providing the capability to deliver energy (primarily the capital costs of facilities)"). Accordingly,
capacity costs have been considered to be among the fixed costs associated with generation assets
that, in theory, are collected through base rates rather than the fuel factor. Preventing what in
concept would be a double-recovery of these fixed costs through both base rates and fuel
reconciliations, the Former Fuel Rule explicitly barred utilities from recovering "demand or capacity
costs" as part of "eligible fuel expenses." See Former Fuel Rule § 23.23(b)(2)(B)(iv). In addition
to relying on this exclusion for "demand or capacity costs," parties opposing EPE's claim for
purchased-power expenses argued that EPE's inclusion of capacity costs attempted to shift base-rate
costs to fuel costs in violation of the 1995 Stipulation/Agreed Order.

 Historically, wholesale purchased-power contracts had identified separately stated
"capacity" or "demand" and "energy" charges--the former generally priced by megawatt (MW) of
capacity guaranteed, the latter priced by megawatt hour (MWh) of energy the purchaser actually
takes. However, the deregulation of the wholesale electric markets in the 1990s had brought greater
variety in the pricing terms under such contracts, which in turn had raised issues regarding whether
contracts that did not identify or contain explicit "capacity" charges might nonetheless represent
the sale of capacity. In a prior fuel-reconciliation proceeding involving another utility, Entergy Gulf
States, the Commission had determined that it could look beyond the face of what were facially
"energy-only" wholesale purchased-power contracts, ascertained that the conveyed "energy" in fact 
included "embedded" capacity, and disallowed recovery of a portion of the utility's claimed
purchased-power expenses on that basis. See Entergy Gulf States, Inc., 173 S.W.3d at 211. In
determining that the Entergy contracts conveyed capacity, the Commission relied on evidence to the
effect that Entergy had deliberately negotiated "energy-only" pricing terms to disguise capacity
charges, as well as characteristics of the transactions that it regarded as consistent with capacity
purchases. See id. These characteristics, in the Commission's view, included the fact that the utility
made block purchases of power that provided the "capacity benefits" of "system-wide reliability
and firmness of supply." See id. In the absence of an explicit capacity charge, the Commission
"imputed" a value for the capacity sold equal to twenty-four percent of the contract price
and deducted that amount from Entergy's eligible fuel expenses. See id. This Court upheld the
Commission's treatment of capacity costs against challenges that it violated the fuel rule and was
not supported by substantial evidence. See id. at 209-12.

 In the present proceeding, following the hearing on EPE's petition, the ALJs issued
a proposal for decision (PFD) in which they reasoned, based on what they perceived to be the
Commission's rationale in the Entergy case, that a wholesale power purchase contains a capacity
charge whenever (1) "the purchased power's cost is above the marginal energy cost for generation"
(in the view that the difference would necessarily reflect the seller's fixed costs of generation) (2) "to
the extent it is used to provide energy for a system's base load or reserve requirements." The ALJs
found that EPE made purchases meeting these criteria in 1999, 2000, and 2001. Additionally, the
ALJs found that a purchased-power contract between EPE and Southwestern Public Service
Company (SPS) covering the year 2000 contained language that, while not containing a discrete
charge for capacity, nonetheless reflected the conveyance of capacity. Similar to their methodology
for identifying capacity costs in purchased-power contracts, the ALJs recommended that the imputed
capacity costs in the contracts be calculated as the positive difference between EPE's purchased-power cost and its marginal cost of generation at its least efficient generating unit, which yielded a
total-company disallowance of $30.5 million.

 After reviewing this PFD and a supplement, the Commission requested additional
briefing as to how it should identify and quantify embedded capacity costs in purchased-power
contracts. The parties, as well as several amici, submitted briefing on that question. The
Commission ultimately reaffirmed "the concept that power contracts that do not contain an explicitly
identified and priced capacity component may nevertheless contain capacity costs." (2) However,
concluding that the briefing "provided multiple and sometimes inconsistent approaches," and
"demonstrated that there is not a single understanding of the concept of capacity," the Commission
ultimately eschewed attempting a "comprehensive solution in this docket." (3) It instead confined
its inquiry to whether the particular EPE purchased-power contracts at issue represented
sales of capacity.

 The Commission rejected the ALJs' proposals to identify and value embedded
capacity purchases based on an excess of the utility's purchased-power costs over its marginal costs
of generation, reasoning that such a difference might be explained by circumstances other than
payment for capacity or other fixed-cost recovery. Instead, the Commission looked first to the
specific language and pricing structure of the contracts, concluding that "[c]apacity costs may be
found in contracts without an explicit capacity charge when contract language indicates that capacity
or demand is part of the purchase." The Commission found that one of EPE's purchased-power
contracts contained such language--the 2000 contract with SPS. The Commission further
concluded, similar to the analysis in Entergy, that "[t]his conclusion is bolstered if the contracts are
made in advance and entered into on a long-term basis as part of annual planning to fulfill obvious
peaking needs and satisfy reliability," and found that the SPS 2000 contract met those criteria. 
Under this contract, the Commission found, EPE had agreed to make block purchases of 50 kW
of energy per month for twelve months, with an additional 50 kW per month for the months of
June through October (a total of 850,000 kW annually), "to supply [its] base load generation needs."
Furthermore, rejecting an argument advanced by EPE, the Commission found that the conveyance
of a "dispatch right"--simply described, the buyer's discretion to determine when or if it wants to
take power and how much--"is only one indicator that a power purchase has a capacity component"
and that even "without a separately priced or labeled capacity element or dispatch rights in the
contracts," the contracts may have embedded capacity costs "if the purchases are intended to ensure
reliability to the base load and cost more than the utility's marginal fuel generation costs."

 As for how these embedded capacity costs should be valued, the Commission found
that it was "reasonable" to use a proxy derived from the Western Systems Power Pool (WSPP)
capacity-charge price cap of $7.32/kilowatt-month, an "amount . . . based upon the fixed costs of the
WSPP's member units and . . . representative of the actual market cost for capacity during the
reconciliation period." Multiplying that proxy charge times EPE's monthly power purchases
yielded a total capacity disallowance of approximately $6.2 million from total company purchased-power expenses.


Special circumstances 

 In addition to arguing that none of the disputed purchased-power contracts
contained capacity costs, EPE alternatively made a "special-circumstances" request to recover those
costs through fuel charges. The Former Fuel Rule permitted a utility to recover demand or capacity
costs otherwise excluded from eligible fuel expenses if the Commission determined that such
treatment was "justified by special circumstances." See Former Fuel Rule § 23.23(b)(2)(B)(v). "In
determining whether special circumstances exist," the rule provided that:


 the commission shall consider, in addition to the other factors developed in the
record of the reconciliation proceeding, whether the fuel expense or transaction
giving rise to the ineligible fuel expense resulted in, or is reasonably expected to
result in, increased reliability of supply or lower fuel expenses than would otherwise
be the case, and that benefits received or expected to be received by ratepayers
exceed the costs that ratepayers otherwise would have paid or otherwise would
reasonably expect to pay.


Id. The Commission failed to find special circumstances and did not grant EPE's request that it be
permitted to recover any imputed capacity charges on that basis.


Off-system sales

 Under the 1995 Stipulation/Agreed Order, EPE was required to apply a portion of the
margins it earned (i.e., revenues less expenses) from "off-system" sales (wholesale sales to entities
that are not native-load customers (4)) as a credit against the fuel costs allocated to Texas retail
customers. (5) Consequently, the higher EPE's calculated margins were on its off-system sales
(whether as a function of higher revenues, lower expenses, or both), the larger the credits against
EPE's fuel costs, and the lower the eligible fuel costs that the utility could recover from its
Texas retail customers.

 Under a long-term contract it executed in the 1980s, EPE had agreed to sell the
Imperial Irrigation District (IID) in California 50 MW of contingent capacity (i.e., depending on
availability) with energy, to be served from EPE's total system resources. In return, IID agreed to
pay EPE a demand charge, and a charge for energy equal to EPE's average system production costs
plus a margin of $0.00236/kilowatt-hour. In its reconciliation petition, EPE calculated its margins
from its sales of contingent capacity and energy to IID (which were considered off-system sales) (6)
utilizing its average system production cost, a treatment it viewed as consistent with its contractual
obligation to serve the sales from its total system resources. Similarly, EPE allocated the average
production costs and resultant margins among the jurisdictions it serves--Texas, New Mexico,
and the wholesale or "federal" jurisdiction, treating IID as a separate wholesale customer. The City
asserted that EPE instead should have calculated margins based on its incremental costs of these
sales and that no portion of the margins should have been allocated to the wholesale jurisdiction.
Consequently, the City reasoned, EPE's calculation overstated the eligible fuel costs properly
allocable to the utility's Texas retail customers. Both the ALJs and the Commission rejected the
City's assertions.


Proceedings below

 EPE and the City each sued for judicial review of the Commission's order. The
suits were consolidated. The district court subsequently rendered final judgment affirming the
Commission's order in full. Both EPE and the City have appealed.


ANALYSIS

 EPE brings four issues on appeal. The first three challenge the Commission's
imputation of capacity costs to its SPS 2000 contract. EPE asserts that (1) substantial evidence does
not reasonably support the Commission's findings that the SPS 2000 contract contained embedded
capacity costs; (2) the Commission's decision to impute capacity costs to the contract violates the
"letter and spirit" of the 1995 Stipulation/Agreed Order; and (3) the Commission's imputation of
capacity costs to the contract is preempted by the filed-rate doctrine. In its fourth and final issue,
EPE asserts in the alternative that the Commission's refusal to grant its special-circumstances request
was arbitrary and capricious.

 The City brings three issues in its appeal. First, it argues that the Commission's
decision to reject the ALJs' recommendations concerning the amount and cost of imputed capacity
charges was the result of improper procedure and not supported by substantial evidence. In its
second and third issues, the City complains that substantial evidence does not support the
Commission's calculation of EPE's margins from its off-system sales to IID or its jurisdictional
allocation of those margins.


Standard of review

 We review the Commission's order here under the Administrative Procedure Act's
(APA) "substantial-evidence" standard. See Tex. Util. Code Ann. § 15.001 (West 2007) ("Any
party to a proceeding before the commission is entitled to judicial review under the substantial
evidence rule."). This standard requires that we reverse or remand a case for further proceedings "if
substantial rights of the appellant have been prejudiced because the administrative findings,
inferences, conclusions, or decisions" are


(A) in violation of a constitutional or statutory provision;


(B) in excess of the agency's statutory authority;


(C) made through unlawful procedure;



(D) affected by other error of law;


(E) not reasonably supported by substantial evidence considering the reliable and
probative evidence in the record as a whole; or


(F) arbitrary or capricious or characterized by abuse of discretion or clearly
unwarranted exercise of discretion.



Tex. Gov't Code Ann. § 2001.174(2) (West 2008). However, we may not substitute our judgment
for that of the agency on the weight of the evidence on matters committed to agency discretion. Id.
§ 2001.174(1); Southwestern Pub. Serv. Co. v. Public Util. Comm'n of Tex., 962 S.W.2d 207, 215
(Tex. App.--Austin 1998, pet. denied). With respect to subparagraph (E), "substantial evidence"
does not mean a large or considerable amount of evidence but such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion of fact. Pierce v. Underwood, 487 U.S. 552,
564-65 (1988); Lauderdale v. Texas Dep't of Agric., 923 S.W.2d 834, 836 (Tex. App.--Austin 1996,
no writ). The test is not whether the agency made the correct conclusion in our view, but whether
some reasonable basis exists in the record for the agency's action. Railroad Comm'n of Tex. v. Pend
Oreille Oil & Gas Co., Inc., 817 S.W.2d 36, 41 (Tex. 1991). We must uphold an agency's finding
even if the evidence actually preponderates against it, so long as enough evidence suggests the
agency's determination was within the bounds of reasonableness. Southwestern Pub. Serv. Co.,
962 S.W.2d at 215.

 To the extent that the parties' issues turn on the construction of a statute, we review
these questions de novo. First Am. Title Ins. Co. v. Combs, 258 S.W.3d 627, 631 (Tex. 2008).
Although we are to give "serious consideration"--i.e., deference--to a governmental agency's
construction of a statute it is charged with administering, this principle presupposes that the statute
is ambiguous and the agency's construction is reasonable and does not conflict with the statute's
language. Railroad Comm'n of Tex. v. Texas Citizens for a Safe Future & Clean Water, 336 S.W.3d
619, 624-25 (Tex. 2011).

 In general, "[w]e construe administrative rules, which have the same force as
statutes, in the same manner as statutes." Rodriguez v. Service Lloyds Ins. Co., 997 S.W.2d 248, 254
(Tex. 1999). "Unless the rule is ambiguous, we follow the rule's clear language." Id. However,
similar to the "serious consideration" principle where it applies, we defer to an agency's
interpretation to the extent the regulation is ambiguous or leaves room for policy determinations, but
not where the administrative interpretation is plainly erroneous or inconsistent with the regulation.
Id. at 254-55 (quoting Public Util. Comm'n of Tex. v. Gulf States Util. Co., 809 S.W.2d 201, 207
(Tex. 1991)).

 In interpreting the purchased-power contracts at issue here, as well as the
1995 Stipulation/Agreed Order, we are guided by principles of contract construction. See Cities of
Abilene v. Public Util. Comm'n of Tex., 146 S.W.3d 742, 747 (Tex. App.--Austin 2004, no pet.).
Construction of an unambiguous contract presents a question of law that we review de novo. See
State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). In construing a written contract, the primary
concern of the court is to ascertain the true intentions of the parties as expressed in the instrument.
J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003). We must examine and consider
the entire writing in an effort to harmonize and give effect to all the provisions of the contract so
that none will be rendered meaningless. Id. at 229. No single provision taken alone will be given
controlling effect; rather, all the provisions must be considered with reference to the whole
instrument. Id.

 Likewise, the threshold question of whether a contract is ambiguous is a question
of law for the court. Id. If a contract is unambiguous--i.e., it can be given a definite or certain
legal meaning--an administrative interpretation of the contract is not entitled to a presumption
of validity. Cities of Abilene, 146 S.W.3d at 748. If a contract is found to be ambiguous--i.e.,
susceptible to more than one reasonable meaning, such that the parties' intent must be determined
as a matter of fact--we must affirm the agency's interpretation if it is supported by substantial
evidence. Id.


Capacity costs

 EPE's issues 

 We first consider EPE's three issues challenging the Commission's imputation of
capacity costs to the SPS 2000 contract. In support of its first issue--challenging whether substantial
evidence supports the Commission's findings and conclusions that the contract reflected a
conveyance of capacity--EPE begins by arguing that the Commission's findings are predicated upon
an erroneous construction of the contract.

 Under the contract, as EPE acknowledges, it agreed to the following: 

 

 [EPE] agrees to purchase and [SPS] agrees to provide, during the term of this
Transaction Agreement, Firm Power Service in the amount of 50 Megawatts for
all months during the term, and an additional 50 Megawatts for the months of
June through October ("Firm Power").



(Emphasis added.) EPE further acknowledges that the contract defines "Firm Power Service" as:

 


 that quantity of firm capacity, with reserves, and associated energy that the Company
will make continuously available to the Customer from the Company's generation
resources, which include capacity purchases.



(Emphases added.) Although their plain text, standing alone, would seem to suggest otherwise, EPE
insists that when these provisions are construed in conjunction with other portions of the contract,
it becomes apparent that the provisions merely contemplate that EPE could purchase capacity under
the contract and do not establish that EPE actually did so. See J.M. Davidson, Inc., 128 S.W.3d
at 229 (contractual provisions must be construed with reference to the entire instrument and
all provisions given effect). EPE emphasizes other portions of the contract defining "demand
charges"--the "amount, if any, to be paid by the Buyer to Seller for capacity as agreed to by the
Parties in a Transaction"--and "contract price"--"the price in $U.S. per MWh (unless otherwise
provided for) to be paid by Buyer to Seller for the purchase of Power, including the Power Price,
Demand Charges, Transmission Charges and any other charges, if any, pursuant to a Transaction."
(Emphases added.) Together, these provisions, EPE contends, reflect only a contract whereby it
might agree to purchase capacity or "demand," and contemplating that, in such an event, SPS would
impose a separate, explicit charge for that product. Because there is no evidence that SPS imposed
or EPE paid any explicit charges for "capacity" or "demand" in connection with the purchased-power
expenses it claims under the SPS 2000 contract, EPE reasons, the evidence establishes as a matter
of law that it did not purchase capacity. (7) 

 Relatedly, EPE argues more broadly that the "firm power service" it purchased
under the SPS 2000 contract, though defined with reference to "capacity," did not actually represent
a purchase of capacity if that term is properly understood. EPE points to the testimony of
Steve Buraczyk, its Supervisor of Resource Management, who asserted that the reference to
"capacity" in the contract's "firm power service" definition referred to an obligation of SPS to back
the sale with its own reserves and capacity purchases. While EPE acknowledges that this "firm
energy purchase . . . backed by the seller's capacity provides a greater degree of reliability because
the seller must plan for the sale as part of its native load and resources plan," it insists that the
transaction nevertheless does not signify a capacity purchase because "it does not provide the type
of planning flexibility to the purchaser traditionally associated with the purchase of capacity." Citing
further testimony of Buraczyk and its other witnesses, EPE urges that a capacity product is
distinguished by a fixed premium, separate from energy charges, that conveys dispatch rights on the
part of the buyer, such that the buyer has the right--though not the obligation--to schedule or call
upon energy up to the contract amount if and when needed. Only if and when a capacity purchaser
opts to take power, EPE adds, would it pay an energy charge for the power it took. What EPE
purchased under the SPS 2000 contract, the utility asserts, was not "capacity" in this sense because
it did not pay a fixed premium for or receive dispatch rights. Instead, EPE insists, it purchased a
distinct "firm energy" product, requiring EPE either to take power in the specified amount or pay
liquidated damages. EPE further emphasizes evidence that it did not subjectively intend to purchase
capacity (so defined), citing testimony from Buraczyk that the utility opted to purchase blocks of
"firm energy" rather than "capacity" because it perceived this approach to be more cost-effective and
to provide it greater flexibility. Similarly, EPE urges that whether the contract reflected a "long-term
purchase . . . made in advance as part of [its] planning process designed to meet [its] resource needs
for reliability," as the Commission found, was not in itself determinative of a capacity purchase
because the same might be said of its "firm energy" purchase.

 EPE's arguments disputing whether the SPS 2000 contract conveyed "capacity"
ultimately rest upon a construction of that term as it was used in Former Fuel Rule
§ 23.23(b)(2)(B)(iv)'s exclusion of "demand or capacity costs" from recoverable "eligible fuel
expenses." Undercutting EPE's arguments, the rule does not require that a sale of "capacity" include
dispatch rights or that there be an explicit charge for capacity. Indeed, the rule does not specify
any definition of "demand or capacity costs" or explain how such costs are to be determined. The
Commission's findings and conclusions, previously summarized, reflect that it construed and applied
the rule in a manner consistent with the historical association of "capacity" charges with a wholesale
seller's fixed costs of making generation assets available to generate power, see City of El Paso,
851 S.W.2d at 898; Gulf States Utils., 841 S.W.2d at 461, and the objective--mandated in both the
Former Fuel Rule and the 1995 Stipulation/Agreed Order--of preventing recovery of such base-rate
costs in the guise of reconcilable fuel expenses. 

 As the Commission concluded, the conveyance of a dispatch right--which entails a
corresponding duty on the part of the wholesale seller to make its generation assets available separate
and apart from any sales of energy that transpire--is "one indicator that a power purchase contract
has a capacity component," but it is not the exclusive indicator. While the SPS 2000 contract did
not convey dispatch rights to EPE, the Commission concluded that it nonetheless reflected a
conveyance of capacity. This conclusion is supported by the text of the contract. The "firm power
service" EPE purchased explicitly included "firm capacity, with reserves, and associated energy that
[SPS] will make continuously available to [EPE] from the Company's generation resources, which
include capacity purchases." EPE agreed to purchase and SPS agreed to provide "50 Megawatts of
[firm power service] for all months during the [contract] term, and an additional 50 Megawatts
for the months of June through October. . . ." EPE agreed to pay specified rates (varying by month)
per MWh of energy supplied, with an additional charge per MWh over the 50 MW for the additional
power provided during June through October. If SPS failed to make the energy available as
requested, EPE was permitted to buy it on the market and require SPS to compensate it for any cost
in excess of the contract price. Although EPE emphasizes that it was obligated to pay "liquidated
damages" if it ultimately did not take the power, urging that this provision distinguishes its "firm
energy" purchase from a true "capacity" purchase entailing dispatch rights, the Commission asserts,
and we agree, that the provision's significance is instead that it can signal compensation to SPS
for fixed costs in making the power available. Additionally, the contract permitted EPE to schedule
power for almost immediate delivery. During the "On-Peak Period," the contract required EPE
to notify SPS on the day before delivery. During the "Off-Peak Period," EPE could notify SPS
two hours before delivery. These features of the SPS 2000 contract, considered as a whole,
demonstrate that the "firm power service" EPE purchased included reciprocal obligations on the
part of SPS to make its generation assets available to provide power, not merely the sale of the
power itself.

 In addition to the contract terms, the Commission also cited the "long-term" nature
of EPE's purchase and that the utility made the purchase to ensure reliability as consistent with the
circumstances in which utilities make capacity purchases. See Entergy Gulf States, Inc., 173 S.W.3d
at 211 (citing these factors, among others, in affirming Commission's order finding embedded
capacity costs); see also AEP Tex. Cent. Co. v. Public Util. Comm'n of Tex., 286 S.W.3d 450,
471 (Tex. App.--Corpus Christi 2008, pet. denied). While disputing whether such facts can be
singularly determinative of a capacity sale, EPE acknowledges that they may nonetheless be
"indicative of a circumstance in which a utility may purchase capacity."

 On this record, the Commission could have reasonably determined that EPE had
paid not only for the variable "energy" costs of the power it took, but SPS's fixed costs of making
its generation assets available. And the Commission's application of the Former Fuel Rule to these
facts to conclude that EPE's purchases had a "capacity" component, we further hold, was reasonable
and not plainly erroneous or inconsistent with the rule. See Rodriguez, 997 S.W.2d at 254;
Gulf States Util. Co., 809 S.W.2d at 207. Consequently, we give it deference, and overrule EPE's
first issue.

 In its second issue, EPE argues that this construction and application of the
Former Fuel Rule violated the terms to which the Commission agreed in the 1995 Stipulation/Agreed
Order. Under this order, as previously explained, EPE and the Commission agreed that the utility's
base rates would be frozen for ten years, the utility would be prohibited from shifting base-rate costs
to fuel costs, and that the utility's cost recovery would be limited solely to the frozen base rates and
"those costs recovered as reconcilable fuel costs according to [the Former Fuel Rule]." Emphasizing
that the order preceded the Entergy case by several years, EPE urges that the rule's exclusion of
"demand or capacity costs," as construed at the time of the agreement and order, did not include the
concept of embedded or imputed capacity purchases, but meant only "capacity" or "demand" charges
that were explicitly identified and charged in purchased-power contracts. EPE also points to
evidence that, by 1995, single-priced energy purchases had already come into existence and that it
had made firm energy purchases without having a capacity charge imputed. By subsequently
imputing capacity costs to the SPS 2000 contract, EPE complains, the Commission "turns the 1995
understanding of capacity costs on its head" and, in EPE's view, violated its agreement to permit
EPE to recover fuel costs as it would have been permitted to do in 1995.

 The Commission responds that EPE is "simply wrong" that it had denied the utility
recovery of purchased-power costs to which it would have been entitled in 1995. It emphasizes
that the Former Fuel Rule has always denied recovery of "demand or capacity costs" in fuel
reconciliations and that this prohibition has not been limited solely to capacity or demand costs that
are separately priced. That the exclusion had typically been applied to explicit "capacity" charges
(as the charges were commonly imposed prior to wholesale market deregulation) or had not been
applied to some other EPE purchased-power agreement, the Commission reasons, did not preclude
its application where, as here, it determines that capacity costs are embedded in what are nominally
energy costs.

 As previously suggested, the Commission's construction of the Former Fuel Rule
is reasonable, not plainly erroneous or inconsistent with the rule, and entitled to deference. See
Rodriguez, 997 S.W.2d at 254; Gulf States Util. Co., 809 S.W.2d at 207. That rule, in turn, defines
what costs EPE can recover under the plain language of the 1995 Stipulation/Agreed Order: "[T]he
only costs that may be recovered . . . are those costs recovered as reconcilable fuel costs according
to [the Former Fuel Rule]." Under the Former Fuel Rule, capacity costs may not be recovered as
eligible fuel expenses, and there is no language in the 1995 Stipulation/Agreed Order limiting
application of the Former Fuel Rule solely to explicitly identified "capacity" costs as opposed to
imbedded capacity costs. Rather, it simply and unambiguously provides that capacity costs are not
recoverable as eligible fuel expenses. See Cities of Abilene, 146 S.W.3d at 747 (primary concern
in construing agreement is to ascertain true intentions of parties as expressed in written instrument).
Accordingly, we overrule EPE's second issue.

 In its third issue, EPE argues that the Commission's imputation of capacity costs to
the SPS 2000 contract is preempted by the filed rate doctrine because the contract was filed with
and accepted by the Federal Energy Regulatory Commission (FERC). The parties agree that FERC
has exclusive jurisdiction to regulate the sale of electricity at wholesale in interstate commerce. See
16 U.S.C. § 824(b) (2010) (jurisdiction extends to "the transmission of electric energy in interstate
commerce and to the sale of electric energy at interstate commerce"); Entergy La., Inc. v. Louisiana
Pub. Serv. Comm'n, 539 U.S. 39, 41 (2003); Entergy Gulf States, Inc., 173 S.W.3d at 207. Further,
it is undisputed that, when FERC has set a rate between a purchaser and seller of wholesale power,
a state may not exercise its jurisdiction over retail sales to prevent the seller from recovering the
FERC-approved rate, impermissibly "trapping" costs. Mississippi Power & Light Co. v. Mississippi
ex rel. Moore, 487 U.S. 354, 372 (1988). The parties also agree that FERC-set wholesale rates apply
in this instance. (8) They disagree, however, as to whether, because the SPS 2000 contract was filed
with and accepted by FERC, the Commission is jurisdictionally prohibited from determining the
manner by which retail rates may be recovered. See id.

 As the Commission observes, it has not challenged the reasonableness of EPE's
FERC-filed rates, and whether EPE can fully recover its purchased-power costs is not at issue.
Rather, the question presented is how these costs can be recovered--through base rates or the fuel
factor. While the filed-rate doctrine prohibits the Commission from challenging EPE's FERC-filed
rates, the Commission's determination of the manner by which those rates can be recovered is
consistent with the doctrine and FERC's authority. See, e.g., Centerpoint Energy Entex v. Railroad
Comm'n of Tex., 208 S.W.3d 608 (Tex. App.--Austin 2006, pet. dism'd); Gulf States Utils.,
841 S.W.2d at 459.

 EPE argues that, by imputing a capacity cost that was not expressly included in the
FERC-filed tariff, the Commission has failed to give binding effect to a FERC-approved power rate
and, by failing to do so, has varied the express terms of the SPS 2000 contract. According to EPE,
"the Commission has imputed a demand or capacity cost when the FERC-approved rate contained
none." However, EPE's argument rests on the incorrect assumption that the FERC-approved rate
did not include capacity costs. Consequently, we overrule EPE's third issue for the same reasons
we have rejected its first two.

 In its fourth and final issue, asserted as an alternative to its arguments challenging
whether the Commission properly imputed capacity costs to the SPS 2000 contract, EPE urges
that the Commission abused its discretion in refusing to grant EPE's special-circumstances
request and preventing EPE from recovering the costs as part of its reconcilable fuel expenses. See
Former Fuel Rule § 23.23(b)(2)(B)(v). EPE asserts that the record demonstrates that its purchases
"giving rise to the ineligible fuel expense . . . resulted in, or is reasonably expected to result in,
increased reliability of supply or lower fuel expenses than would otherwise be the case, and that such
benefits received or expected to be received by ratepayers exceed the costs that ratepayers would
have paid or otherwise would reasonably expect to pay." Id. § 23.23(b)(2)(B). EPE emphasizes
the Commission's findings that its power purchases under the SPS 2000 contract were aimed at
ensuring reliability. It also cites evidence to the effect that it always purchased the cheapest available
power product to reliably serve its customers. EPE additionally urges that unless it is permitted to
recover these costs, its ability to recover its "legitimate" fuel costs will be forever precluded--i.e.,
the costs will be "trapped." Finally, EPE asserts that because the Commission only disallowed
expressly delineated capacity costs when the 1995 Stipulation/Agreed Order was adopted, EPE had
no notice that its purchased-power contracts would be subject to an imputed-capacity analysis and, as
a result, it was deprived of procedural due process. Under these circumstances, EPE argues, special-circumstances treatment is justified, and it was arbitrary and capricious for the Commission to
determine otherwise. We disagree.

 First, we note that at all relevant times, Commission rules expressly prohibited
the recovery of capacity costs as eligible fuel expenses. See id. § 23.23(iv); 16 Tex. Admin. Code
§ 25.236. Thus, EPE has had notice that it would not be allowed to claim capacity costs as eligible
fuel expenses. The fact that this rule had been previously applied by the Commission to exclude
only separately-priced capacity costs does not prohibit the Commission from disallowing capacity
costs it otherwise finds in contracts, nor does it somehow render EPE's awareness of the prohibition
less comprehensive. Plainly stated, the Former Fuel Rule disallows capacity costs as recoverable
fuel expenses.

 Further, even assuming that EPE's actions would satisfy certain of the non-exclusive
special-circumstances factors listed in Former Fuel Rule § 23.23(v), we cannot conclude that the
Commission acted arbitrarily and capriciously in denying special-circumstances treatment. Capacity
costs, as previously explained, are among the fixed costs that are recoverable through base rates.
Consequently, each time EPE resold the power it had purchased from SPS, its base rate compensated
it for capacity costs--i.e., no costs were "trapped." See Entergy Gulf States, Inc., 173 S.W.3d at 209
(rejecting "trapping" argument because utility failed to show that it had not recovered its non-fuel
costs through its base rate). For the same reasons, to permit EPE to recover the same costs as part
of fuel expenses would result in a double recovery. Given that the Former Fuel Rule's exclusion of
capacity costs from reconcilable fuel costs reflects the policy goal of preventing such double
recoveries, we cannot conclude that the Commission acted arbitrarily or capriciously in refusing
EPE's special-circumstances request. We overrule EPE's fourth issue.


 The City's issues 

 In contrast to EPE, which contends that the Commission erred in imputing and
excluding any capacity costs from its purchased-power expenses during the reconciliation period,
the City complains in its first issue that the Commission did not go far enough in excluding such
costs. The City argues, first, that the Commission did not follow proper procedure in rejecting the
ALJs' findings and conclusions regarding the existence and amount of capacity costs in EPE's
purchased-power contracts.

 The APA authorizes the Commission to change an ALJ's findings of fact or
conclusions of law or to modify an order issued by an ALJ if the Commission determines that a
finding of fact was not supported by a preponderance of the evidence or if the Commission
determines that the ALJ has misapplied or misinterpreted prior agency decisions. See Tex. Gov't
Code Ann. § 2003.049(g) (West 2008). Under section 2003.049(g), the Commission may substitute
its judgment for the ALJ's on questions of fact. Southwestern Pub. Serv. Co., 962 S.W.2d at 214.
To modify an ALJ order, however, the agency must "state in writing the specific reason and legal
basis for its determination." See Tex. Gov't Code Ann. § 2003.049(h); Southwestern Pub. Serv. Co.,
962 S.W.2d at 214.

 Here, the Commission rejected the ALJs' proposal to impute $30.05 million in
capacity to EPE's purchased-power contracts both on the grounds that the ALJs had misinterpreted
prior Commission decisions and that their findings were inconsistent with the evidence. As the
Commission explained in its final order:


 The Commission has historically looked to the pricing structure in purchased-power
contracts to determine whether the contract contained capacity costs. Deregulation
of the electric industry has necessarily led to many changes. One of those changes
has been a trend to change the pricing of purchased-power contracts. Pricing is no
longer constrained by cost-of-service regulations; contracts now reflect free-market
considerations. The question now faced by this Commission is how to identify
capacity costs in market-based purchased-power contracts.


 . . . . 


 This contract contained language indicating that there was a capacity component
to the purchase even though there was no explicit charge for that component. In
addition, that contract was for a long-term purchase and was made in advance as part
of EPE's planning process designed to meet EPE's resource needs for reliability. The
power was purchased to serve native peak load and included additional purchased
power during the peak summer months of the contract. Because of the contract
language, and because of other characteristics of the contract and manner in which
the power was acquired and used are consistent with such a finding, the Commission
finds that the SPS contract included capacity costs in the contract price.



The Commission also explained that, in its view, the ALJs had misinterpreted and misapplied the
Commissions's reasoning in the Entergy case. We conclude that the Commission's modifications
of the ALJs' findings, conclusions, and proposed order were not improper procedurally. See id. 

 The City also urges that the Commission's chosen method for calculating imputed
capacity costs and the amount it ultimately determined were not supported by substantial evidence.
We disagree.

 The Commission concluded that the WSPP price cap of $7.32/kW-month was a
"reasonable" proxy for the capacity costs contained in the SPS 2000 contract, observing that "[t]he
amount is based upon the fixed costs of the WSPP's members' units and is representative of the
actual market cost for capacity during the reconciliation period." Although the City argues that there
is no evidence to support the Commission's conclusions because the WSPP agreement itself was
never admitted into evidence, the evidence in the record reasonably supports the Commission's
conclusion. In proposing the WSPP proxy, EPE presented evidence in the form of rebuttal testimony
from its witness Steve Buraczyk regarding examples of capacity charges in products available
in EPE's market. Buraczyk testified that "the WSPP agreement . . . includes a cost-based price cap
for fixed costs that is $7.32/kW-month," and that the "WSPP agreement is an industry-recognized
form agreement that is available on the WSPP website." Burzaczyk gave several examples of
capacity or demand charges in the western market during an eight-year period that included the
reconciliation period. He identified a 1998 contract to purchase capacity from SPS for one year that
contained a separately-stated, fixed capacity charge of $4.578/kW-month. Buraczyk also identified
a 2002 contract for delivery of capacity that contained a separately-stated, fixed capacity charge of
$5.31/kW-month.

 In addition, EPE presented evidence showing that the WSPP includes more than
220 members, comprised of a diverse group of sellers and consumers involved in wholesale
transactions; that the WSPP agreement is a pool-wide, cost-based rate, filed with FERC; that EPE
conducted most of its wholesale transactions under the terms of this agreement during the
reconciliation period; that this pool-wide approach has been upheld in federal court; (9) and that
the 7.32/kW-month fixed cost price cap is based on the FERC's analysis of WSPP members,
including EPE, that are likely to participate in power purchases. Based on this evidence, there was
a reasonable basis for the Commission's decision to use the $7.32/kW-month proxy. See
Southwestern Pub. Serv. Co., 962 S.W.2d at 215. From here, the Commission multiplied the proxy
measure times the amount of purchased power EPE acquired under the SPS 2000 contract to yield
the $6.2 million total company disallowance. It follows from the foregoing that this total, too, was
reasonably supported by substantial evidence.

 In addition to arguing that the Commission's choice and application of the
WSPP proxy was not supported by substantial evidence, the City urges that substantial evidence does
not support the Commission's decision not to impute capacity costs to other EPE purchased-power
contracts during the reconciliation period. The City's complaint is premised on the validity of the
ALJs' proposed methodology for identifying capacity--i.e., that capacity costs exist under the
contracts because EPE paid more for the power it acquired than its own marginal cost of generation.
In rejecting the ALJ's methodology, the Commission acknowledged that a variety of market factors
other than fixed-cost recovery could explain why a utility would pay more for "energy" costs than
its own variable costs of generation. The Commission noted, for example, that EPE did not have
sufficient generation to serve all of its load during the reconciliation period. In light of this, the
Commission acted reasonably in concluding that looking primarily to this cost differential would not
be a viable indicator of when capacity costs are imbedded in a purchased-power contract. Further,
the evidence shows that the contracts for 1999 and 2001 do not include the kind of language that the
Commission relied on in the SPS 2000 contract to determine that the SPS 2000 contract included
capacity costs. For example, the 1999 and 2001 SPS contracts did not define "firm power service"
as "that quantity of firm capacity with reserves, and associated energy that the Company will make
continuously available to the customer for the Company's generations resources, which include
capacity purchases." In sum, the Commission's conclusion that only the SPS 2000 contract included
capacity costs is supported by substantial evidence. We overrule the City's first issue.


Off-system sales

 The City's remaining two issues concern the calculation and allocation of EPE's
margins from off-system sales--i.e., its sales of contingent capacity with energy--to IID during the
reconciliation period. Specifically, the City asserts that substantial evidence does not support the
Commission's decision to permit EPE (1) to use its average system-wide cost of producing power,
rather than its incremental cost, in determining its margins from the sales, and (2) to allocate a
portion of those margins to the wholesale or "federal" jurisdiction.

 In regard to these issues, the Commission made the following pertinent fact findings:

 

 53. It is not appropriate to assign an incremental cost to the IID-C sales in order
to calculate the margin for those sales because, unlike opportunity sales, they
are not based on incremental costs.


 54. Consistent allocation of the Company's margins requires the IID-C sales to
be included in the jurisdictional allocation because the sales are served from
the Company's total system.



 Costs

 According to the City, the Commission should have calculated EPE's margins from
its off-system sales to IID using the difference between the sale price and the calculated cost of the
most expensive generation or resource on EPE's system--i.e., the incremental cost of the
sale--because that is how EPE calculated margins for its other off-system sales and there is no valid
basis in the evidence for treating this sale differently. We disagree.

 There is substantial evidence to support the Commission's approval of the calculation
method EPE used here. Most notably, the IID contract terms specify that EPE's sales are to be
served from its total system resources. In other words, as the Commission found, EPE's off-system
sales were not "opportunity" sales, where a utility sells power based on an opportunity to earn
revenue exceeding the marginal or incremental cost of generation, but were based instead on a
contractual commitment to sell power at a price determined according to a contractual formula,
contingent upon the utility having sufficient capacity in its total system. Additionally, EPE's charges
are calculated based on a base-fuel cost, plus an adjustment charge derived from the cost of fossil
and nuclear fuel consumed in EPE's plants, actual costs associated with purchased energy, net energy
costs of economic dispatch, and the cost of fossil and nuclear fuel recovered through inter-system
sales. As EPE's witness Thomas Newsom confirmed, this pricing scheme reflects the contractual
requirement that the sales be served from EPE's total system resources. Under this contract,
Newsom further opined, it was inappropriate to calculate EPE's margins from the sale based on the
incremental costs of those sales. This evidence reasonably supports the Commission's findings
that EPE's margins from the sales should--consistent with the contract--be determined based
on average systemwide costs of producing power rather than incremental costs. We overrule the
City's second issue.


 Allocation of margins

 Although the City's complaint about EPE's allocation of the IID off-system sales
margins is presented as an issue distinct from its challenge to the Commission's choice of average
systemwide costs over incremental costs in determining those margins, the two are logically
connected to the extent the Commission found that "[c]onsistent allocation of [EPE]'s margins
requires the IID[] sales to be included in the jurisdictional allocation because the sales are served
from [EPE]'s total system." EPE's witness Newsom testified that EPE had consistently treated IID
as a separate wholesale customer for jurisdictional allocation purposes and that the pricing of the
sales dictates the allocation. He testified that, to be consistent, the IID sales must be included in
the jurisdictional allocation because the sales are served from the entire system. Although the City
disagreed with the method used and proffered testimony that off-system sales customers, such as IID,
should not be allowed to share in the profits arising from energy sales to those facilities because they
have not paid for the generation facilities, Newsom's testimony, along with the evidence relevant
to the cost issue, reasonably supports the Commission's finding that the IID sales should be included
in the jurisdictional allocation. Accordingly, we overrule the City's third issue.


CONCLUSION

 Having overruled each issue presented by EPE and the City, we affirm the district
court's judgment.



 __________________________________________

 Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton;

 Justice Patterson not participating


Affirmed


Filed: July 1, 2011
1. Except where there has been a material intervening substantive change, we cite the current
versions of statutes and rules for convenience. 
2. The Commission subsequently applied the same concept in the final fuel reconciliation of
AEP Texas Central Company. See AEP Tex. Cent. Co. v. Public Util. Comm'n of Tex., 286 S.W.3d
450, 471 (Tex. App.--Corpus Christi 2008, pet. denied).
3. After this case was decided, the Commission initiated a rule-making proceeding to
establish a methodology for identifying and quantifying imputed capacity costs. See Entergy Gulf
States, Inc. v. Public Util. Comm'n of Tex., 173 S.W.3d 199, 212 (Tex. App.--Austin 2005,
pet. denied). However, no rule was adopted at that time.
4. I.e., the retail and wholesale customers to whom a utility is required to provide service. 
See Entergy Gulf States, Inc., 173 S.W.3d at 204 n.3; see also 18 C.F.R. § 33.3(d)(4)(i) (2010)
(Federal Energy Regulatory Commission, Regulations under the Federal Power Act) ("Native load
commitments are commitments to serve wholesale and retail power customers on whose behalf the
potential supplier, by statute, franchise, regulatory requirement, or contract, has undertaken an
obligation to construct and operate its system to meet their reliable electricity needs.").
5. Between January 1999 through June 2000, this percentage was twenty-five percent of the
margins. During the remainder of the reconciliation period, there was a 50-50 split.
6. EPE also sold firm capacity and energy to IID as part of its native load.
7. EPE also contrasts this absence of explicit "capacity" charges with examples of
transactions where it did explicitly purchase "capacity."
8. The City asserts that "EPE does not identify where in the record this contract was the
subject of a FERC proceeding, or a FERC approved rate," but the SPS Master Power Purchase and
Sale Agreement expressly provides that its effectiveness is "contingent upon its acceptance for filing
by the FERC."
9. See Environmental Action v. Federal Energy Regulatory Comm'n, 996 F.2d 401, 408-09
(D.C. Cir. 1993).